KENNEDY *v.* NILES WATER SUPPLY CO.

1. WATERS AND WATERCOURSES—LAKES—RIPARIAN RIGHTS.
   Proprietors of the land upon the banks of a stream or a lake have a common usufructuary right to the water, as it is in a state of nature.

2. SAME—PRESCRIPTION—ADVERSE USER.
   Unless the rights of other common owners are invaded or interfered with, an excessive use by a riparian owner, however long exercised, of the rights that he holds in common with the others will not ripen into a prescriptive right, and, as in other cases, the adverse user, in order to create a permanent right, must be visible, continuous and notorious, and must continue for the period required to secure by prescription rights in realty.

3. SAME—PRESCRIPTION—ESTOPPEL.

> Although the owners of property on the shores of a small inland lake had remained acquiescent while defendant took water from it in a twelve-inch pipe, during upwards of 30 years, they were entitled to restrain any further invasion of their riparian rights involved in defendant's laying new pipes at greater depth, and were not estopped from enjoining the wrongful action in equity.

BROOKE, McALVAY, and BIRD, JJ., dissenting.

Appeal from Cass; DesVoignes, J. Submitted November 6, 1911. (Docket No. 44.) Decided January 3, 1913.

Bill by Richard Kennedy and others against the Niles Water Supply Company and others for an injunction restraining defendant from drawing water from Barron Lake. From a decree for complainants defendants appeal. Affirmed.

*M. L. Howell*, for complainants.

*J. J. Van Riper* and *A. J. Mills*, for defendants.

OSTRANDER, J. Proprietors of the land upon the banks of a stream, or a lake, have a common usufructuary right to the water as it is in a state of nature.

So long as the use made of the water by a common proprietor is the common use, an excessive use, however long continued, will not ripen into a prescriptive right, so long as other common owners are not injured thereby, or prevented, or excluded from making such use as of common right belongs to them. If a wrongful use is made of the water of a running stream by a common proprietor, as if he finally diverts the water, such use is by common consent presumed to be injurious to other common proprietors and therefore adverse. As in other cases, the adverse user, in order to ripen into a right to use, must be visible, continuous, and notorious, and must continue for the period required to acquire rights in real property adversely to the owner. 2 Farnham on Waters and Water Rights, §§ 537–541.

Assuming for the purposes of this case (we may indulge the assumption because complainants have not appealed from the decree of the court below) that defendants have acquired the right to take water from Barron Lake, I think the proposition advanced by Mr. Justice BROOKE in his opinion, namely, "that the gist of the easement lies in the quantity of the water taken and not in the particular method in which it is taken," cannot be sustained. It was a common right of the particular riparian owners to have the lake at its natural level. The level of a lake, it is true, depends upon the quantity of water it contains; it is higher or lower as the quantity of water. But the interest of the owners of the shore, there being visible neither an inlet nor outlet, was affected by a diversion of water only as such diversion affected the level of the lake. With the laying of the first, or 12-inch, pipe, the level of the lake could be in no case reduced below the mouth, or intake, of the pipe. What was threatened (and this is the measure and limit of the adverse right asserted by defendants' assignors) was the lowering of the level of the lake to the level of the mouth of the pipe. Whether much or little water was taken hourly, or daily, no lower level could result. The case is not different from one where a ditch had been cut to the lake through which, as was desired, or required, water was diverted. This 12-inch pipe and such apparatus as was used with it furnished the visible evidence of the nature and extent of the trespass which was being committed by the defendants, or, as has been stated, of the right which was being asserted. Assuming that acquiescence in such diversion of the water as could be accomplished by the means thus employed continued for such length of time that complainants would be estopped to deny the right to continue the taking, it does not appear that there has been any acquiescence in the taking of water through pipes laid lower than the original pipe.

The argument advanced by Mr. Justice BROOKE leads irresistibly to the conclusion that, because complainants

acquiesced in the taking of such amount of the water as would flow through the pipe originally laid, defendants have the right, as the level of the lake is lowered, to lay successive pipes until they draw off the last drop of water which the lake contains, provided they do not on any day, or at any time, take a larger quantity of water than was originally taken through the pipe first laid.    I conceive that in laying a 6-inch pipe lower than the original pipe, and in laying a 9-inch pipe, lower than the 6-inch pipe, defendants committed distinct trespasses—asserted new rights.    Those pipes were laid shortly before the bill was filed, and complainants have not acquiesced in diverting the waters of the lake by means of these last-mentioned pipes.    By the laying of those pipes they were threatened, not with the diversion of a larger or smaller quantity of water than formerly, but with a further reduction of the level of the lake below its natural level, with an injury to their premises never threatened before.    The learned circuit judge, as I understand the decree, requires the defendants to obstruct all pipes except the one originally laid and to take no water from the lake except such water as can be taken through the original pipe.    Whether the decree gives to defendants rights greater than they are entitled to is, as I have stated, immaterial because complainants have not appealed.

I am of opinion that the defendants have no ground for complaint, and that therefore the decree ought to be affirmed.

STEERE, C. J., and MOORE, KUHN, and STONE, JJ., concurred with OSTRANDER, J.

BROOKE, J. (*dissenting*).    The bill of complaint in this cause is filed for the purpose of securing an injunction against defendants restraining them from taking any water from Barron Lake.    The complainants are owners of certain lands upon the shore of said lake upon which they have erected hotels and cottages which they use for summer resort purposes.    Complainants Hunter Bros.

own and operate an ice plant on the shore of said lake from which they cut ice to the value of $10,000 annually. The lake is one mile long, one-half mile broad, and has an area of 255 acres. It has no visible inlet or outlet, being fed from underground springs and such surface water as finds its way to it from the surrounding watershed.

In the year 1882, one Solon L. Wiley secured leases from two of the riparian owners upon Barron Lake. These leases covered a right of way from the highway near the lake to the lake in which Wiley had in the year 1877 placed the pipe through which he conveyed the water of the lake to the city of Niles. While these leases do not in terms convey to Wiley and his assigns the right to take such water as a riparian owner, it is obvious that such rights were within the contemplation of the parties, for each lease contains the provision that:

"This lease is to expire whenever the Niles Waterworks or its assigns cease to use the water of Barron Lake, when the said lands and the use thereof are wholly to revert to said parties of the first part."

In the year 1877, and before the acquisition of his rights under these leases, Wiley had laid a pipe from the lake to the city of Niles and commenced to distribute water to the citizens of said city. Later, in the year 1886, Wiley secured a conveyance by way of deed from one Catharine M. Reese of a right of way across her land to the lake—

"Sufficient in width to enable said Wiley to lay down an 18-inch tile or pipe across said land upon the line above described to the gatehouse of the Niles Waterworks, and including said gatehouse, and the pipe line already laid there from Barron Lake. * * * And it is further understood and agreed that this instrument covers the right to draw water from said Barron Lake."

The grantors in these several instruments, at the time the conveyances were made, together owned about one-third of the shore of said lake. The conveyances were all made for a valuable consideration, and the rights conveyed were defeasible only when Wiley or his assigns

should abandon the use of said tile or pipe for conveying water from Barron Lake.

From the year 1877 to the present time the defendants or their assignors have, without interruption, continued to draw water from Barron Lake for the use of the citizens of Niles. In the year 1894, the city of Niles installed a system of waterworks, the water to supply which was taken from artesian wells. After the establishment of the city plant, many of the citizens of Niles took water from that source instead of from the defendants, so that from that time down to the present the amount of water drawn from the lake by defendants has been materially (perhaps by as much as one-half) reduced. As originally constructed a 12-inch pipe was laid from deep water in the lake to a gatehouse on the shore. This pipe discharged into the gatehouse on one side, and the water flowed into the pipe line from the city on the other side. Prior to 1906, the defendants or their predecessors found it necessary at rare intervals to use a pump at the margin of the lake by reason of the fact that the lake level sank to a point which would not permit the water to flow through the 12-inch pipe. Either in that year or the year 1907, defendants installed two other pipes, one a 6-inch pipe running into the gatehouse, the top of which was level with the bottom of the 12-inch pipe. A few weeks later a 9-inch pipe was put in which passed around the gatehouse and connected with the city main. The 9-inch pipe is somewhat lower than either the 6 or 12-inch pipe. Since the installation of the 9-inch pipe, no pumping has been necessary. The reservoir used by defendants in the city contains from 230,000 to 250,000 gallons. When full its contents would satisfy the damands of defendants' customers about 28 hours.

The record shows that each spring the level of the water in Barron Lake is high, and that as the season progresses the waters gradually recede. In unusually dry seasons this recession is greater than in those seasons when the precipitation is greater. It seems clear, too,

that the general level is somewhat lower in late years than it was formerly. The bill of complaint herein was filed in October, 1906, and the final decree entered in September, 1910. The evidence was taken from time to time during the years 1907 and 1908, so that we know nothing of the lake level during the summers of 1909 and 1910, though the record shows that the water was higher in 1907 than in 1906.

The material part of the decree is as follows:

"The defendants and each of them are forever enjoined and restrained from drawing any water from the said Barron Lake when the same shall stand at no higher elevation than the top of the intake pipe in the said screenhouse, or when the same shall stand at less than 12 inches over the floor of the said screenhouse, and that the pipes leading around the said screenhouse shall be obstructed or removed so that no water shall be permitted to pass through the same."

From this decree defendants appeal.

It is claimed by the complainants that by reason of the use of the water by defendants the level of the lake is so lowered as to cause its shores to be exposed, thereby making it unsightly and unhealthy. The record fully establishes the fact that there have been occasions during the past 30 years when the water has been at an unusually low stage. The proof that this condition endangers the health of the inhabitants is not convincing.

Defendants deny that the general level of the waters of the lake can be ascribed to their use thereof. They show that the withdrawal of 200,000 gallons per day (which is approximately the amount they claim is used by their customers) would lower the level but $\frac{1}{35}$ of one inch in a day, or 1 inch in 35 days. This would amount to something less than 4 inches during the four months from July to October, inclusive, while the loss from evaporation alone in this latitude during those months amounts to 17.80 inches. It appears, too, that a large marsh lying to the south has, within the past few years, been drained,

and, while there is no known connection between the ditch draining the marsh and the lake, it is possible that that operation may have had an influence upon the level of Barron Lake.

Added to these causes, it is demonstrated that the advance of civilization, accompanied as it is with the removal of the forest growth and the making of watercourses, tends to permit the moisture to more rapidly escape. There can be no doubt that the general average level of practically all inland lakes and streams is lower than it was when the country was newer and more unsettled.

We must, we think, hold that for the purposes of this case defendants should be treated as riparian proprietors under their several grants. It is probably true, as contended, that their status as such gave them no right to the use of the waters of the lake for nonriparian purposes if such use resulted in damage to the other owners of the shore of the lake. They and their predecessors in title did, however, make such use of the water, and have continued to so use it for a period much longer than is necessary to establish a right by prescription. This right seems to have been recognized by the learned circuit judge; but he, apparently, was of the opinion that the right to take the water was limited to a certain method. We believe that the gist of the easement lies in the quantity of the water taken, and not in the particular method in which it is taken. *Stock* v. *City of Hillsdale*, 155 Mich. 375 (119 N. W. 435).

The position of complainants is that the statute does not commence to run from the time the acts complained of were first performed, but, "from the time that the rights of complainants were first infringed." It seems to us clear that in contemplation of the law the injury commenced on the first day the water was taken from the lake. The mere fact that complainants (or their grantors) were not then resident upon the banks of the lake, and

therefore were not compelled to view its unsightly shores or smell the noxious odors arising therefrom, can have no bearing upon the legal question. It is, we think, well settled that a right to use the waters of a stream (or lake) in a particular manner not justified by natural rights may be acquired by prescription. 2 Farnham on Waters & Water Rights, § 535, and note; Gould on Waters, (3d Ed.) § 329, and cases cited, See, also, *Id.* § 225.

It is urged by defendants that inasmuch as complainants and their grantors have stood by for upwards of 30 years, and while defendants have expended large sums of money in installing and maintaining its plant, and have permitted the alleged unlawful withdrawal of the water during all that time without asserting their legal rights, they should now be held to be equitably estopped from interfering with such use, particularly in view of the fact that it is demonstrated that the amount now taken is materially less than it was during the first 17 years of operation. Upon this branch of the case the following authorities may be consulted: *Payne* v. *Paddock*, Walk. Ch. (Mich.) 487; *Maxwell* v. *Bridge Co.*, 41 Mich. 453 (2 N. W. 639); *Raritan Water Power Co.* v. *Veghte*, 21 N. J. Eq. 463; *Carlisle* v. *Cooper*, 21 N. J. Eq. 576; *Clark* v. *Glidden*, 60 Vt. 702 (15 Atl. 358); *Pennsylvania Railroad Co.'s Appeal*, 125 Pa. 189 (17 Atl. 478); *Penrhyn Slate Co.* v. *Power Co.*, 181 N. Y. 80 (73 N. E. 566, 2 Am. & Eng. Ann. Cas. 782).

While our decision might well rest upon this ground, we prefer to place it upon the ground of prescription heretofore considered. It is clear that the decree as entered below may in any season, and, in the light of past experience, certainly will in the near future, result in the absolute destruction of defendants' property. Defendants are supplying water to about 450 families. To entirely deprive them of water during the weeks or months when the level of the lake was below the point fixed by the decree would be to compel them to procure water

from another source, and defendants could not hope to again supply them during the seasons of high water.

The case made by complainants is not one which appeals to the conscience of a court of equity. By their laches they have made it impossible for the court to enjoin defendants without the infliction of irreparable injury. Under such circumstances equity will not interfere, but will leave the party to his legal remedy if there be one.

The decree of the court below should be reversed, and a decree entered in this court dismissing complainants' bill of complaint.

BIRD and MCALVAY, JJ., concurred with BROOKE, J.