Corrigan, C.J.
Defendant Michigan Department of Environmental Quality (DEQ) and defendant TechniSand, Inc., appeal a Court of Appeals decision holding that the DEQ improperly granted a sand dune mining *511 permit to TechniSand, contrary to the Michigan environmental protection act (MEPA), MCL 324.1701 et seq.[1] The only issue properly before us is whether MEPA authorizes a collateral challenge to the DEQ’s decision to issue a sand dune mining permit under the sand dune mining act (SDMA), MCL 324.63701 et seq., in an action that challenges flaws in the permitting process unrelated to whether the conduct involved has polluted, impaired, or destroyed, or will likely pollute, impair, or destroy natural resources protected by MEPA. Because MEPA does not authorize such a collateral attack, we reverse the decision of the Court of Appeals and remand to that Court for expedited review of the remaining issues of plaintiff Preserve the Dunes (PTD).[2]
I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE
In 1991, defendant TechniSand purchased a sand mining operation with a mining permit that was set to expire in 1993. That permit did not allow mining in adjacent property, the Nadeau Site Expansion Area (NSE), which had been classified in 1989 as a “critical dune” area under MCL 324.35301 et seq.
Mining in critical dune areas was prohibited after July 5, 1989, subject to certain narrowly defined exceptions to MCL 324.63702(1):
Notwithstanding any other provision of this part, the department shall not issue a sand dune mining permit within a critical dune area as defined in part 353 [MCL 324.35301 et seq.] after July 5,1989, except under either of the following circumstances:
(a) The operator seeks to renew or amend a sand dune mining permit that was issued prior to July 5,1989, subject to the criteria and standards applicable to a renewal or amendatory application.
*512 (b) The operator holds a sand dune mining permit issued pursuant to section 63704 and is seeking to amend the mining permit to include land that is adjacent to property the operator is permitted to mine, and prior to July 5, 1989, the operator owned the land or owned rights to mine dune sand in the land for which the operator seeks an amended permit.
In late 1994, TechniSand applied for an amended permit under MCL 324.63702(l)(b). In April 1995, the Department of Natural Resources (DNR)[3] denied the application on the ground that TechniSand was ineligible for an amended permit under subsection 1(b) because it had purchased the operation after July 5, 1989.
In May 1996, TechniSand amended and resubmitted its application and supporting documentation to the DEQ. After a public hearing, the DEQ approved TechniSand’s application on November 25, 1996. TechniSand began mining the NSE area thereafter.
Nineteen months later, in July 1998, PTD sued defendants, seeking injunctive and declaratory relief under MEPA. MEPA provides a cause of action for declaratory and other equitable relief for conduct that is likely to result in the pollution, impairment, or destruction of Michigan’s natural resources. MCL 324.1701 et seq.
PTD alleged that the DEQ violated MEPA when it approved TechniSand’s amended mining permit. It further alleged that TechniSand’s mining conduct violated MEPA. Defendants sought summary disposition because PTD’s action was time-barred. The circuit court denied defendants’ motion.
*513 PTD sought summary disposition after the original circuit judge had retired. His successor ruled that PTD’s claim under the SDMA was indeed time-barred. It also held that plaintiff had established a prima facie MEPA claim on the basis of TechniSand’s mining conduct.
After a seven-day bench trial on the MEPA claim alone, the court ruled that defendants had successfully rebutted PTD’s prima facie case and entered a judgment of no cause of action. The court specifically found that “any adverse impact on the natural resources which will result from the sand mining will not rise to the level of impairment or destruction of natural resources within the meaning of MEPA.”
The Court of Appeals reversed and remanded for entry of an order granting summary disposition for PTD. The Court of Appeals concluded that (1) the DEQ’s decision to grant a permit could be challenged at any time under MEPA and (2) TechniSand did not qualify for a permit under § 63702. The DEQ and TechniSand filed applications for leave to appeal in this Court, and we granted leave.[4]
II. STANDARD OF REVIEW
The issue presented involves a question of statutory interpretation. We review de novo questions of statutory interpretation. Oade v Jackson Nat’l Life Ins Co, 465 Mich 244, 250; 632 NW2d 126 (2001).
in
A. OVERVIEW OF MEPA
MEPA is contained in part 17, MCL 324.1701 et seq., of the Natural Resources and Environmental Protection *514 Act, MCL 324.101 et seq. To prevail on a MEPA claim, the plaintiff must make a “prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources, or the public trust in these resources . ...” MCL 324.1703(1). The defendant may rebut the plaintiffs showing with contrary evidence or raise an affirmative defense that (1) there is no feasible and prudent alternative to the conduct and (2) the “conduct is consistent with the promotion of the public health, safety, and welfare in light of” the state’s concern with protecting Michigan’s natural resources. Id. The focus of MEPA is on the defendant’s conduct.
MEPA provides for immediate judicial review of allegedly harmful conduct. The statute does not require exhaustion of administrative remedies before a plaintiff files suit in circuit court. MCL 324.1701(2). A court may, however, “direct the parties to seek relief” in available administrative proceedings. MCL 324.1704(2).
B. OVERVIEW OF SDMA PERMIT PROCESS
The DEQ may authorize mining in critical sand dune areas under two specific conditions set forth in MCL 324.63702(l)(a) and (b):
(1) Notwithstanding any other provision of this part, the department shall not issue a sand dune mining permit within a critical dune area as defined in part 353 [MCL 324.35301 et seq.] after July 5, 1989, except under either of the following circumstances:
(a) The operator seeks to renew or amend a sand dune mining permit that was issued prior to July 5,1989, subject to the criteria and standards applicable to a renewal or amendatory application.
(b) The operator holds a sand dune mining permit issued pursuant to section 63704 and is seeking to amend *515 the mining permit to include land that is adjacent to property the operator is permitted to mine, and prior to July 5, 1989, the operator owned the land or owned rights to mine dune sand in the land for which the operator seeks an amended permit.
If an operator does not fall within one of these limited exceptions to the SDMA ban on mining in critical dunes areas, the inquiry ends. Nowhere in this initial inquiry is the DEQ required to evaluate the permit seeker’s proposed conduct. Indeed, such an inquiry would be pointless unless the DEQ first determined that the applicant was eligible for a permit on the basis of the applicant’s status as either a past owner or operator.
Once the DEQ determines that an applicant is eligible to apply for a sand dune mining permit in a critical dune area under § 63702(1), the applicant must fulfill the requirements of § 63704. Specifically, applicants are required to submit the following to the DEQ:
(a) A permit application on a form provided by the department.
(b) An environmental impact statement of the proposed mining activity as prescribed by section 63705.
(c) A progressive cell-unit mining and reclamation plan for the proposed mining activity as prescribed in section 63706.
(d) A 15-year mining plan as prescribed by section 63707. [MCL 324.63704(2).]
After the DEQ determines that the applicant has satisfied §§ 63702(1) and 63704(2), it must next determine whether the applicant meets the requirement of § 63709. Section 63709 prohibits the DEQ from approving an amended permit if the applicant’s proposed conduct “is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in those resources, as provided by part 17.” Thus, MEPA, in *516 part 17, MCL 324.1701 et seq., expressly controls the DEQ’s § 63709 determinations.
C. MCL 324.1701 AND NEMETH v ABONMARCHE DEVELOPMENT
In addition to conferring power upon the Attorney General, MCL 324.1701(1) authorizes a private cause of action under MEPA:
The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.
MCL 324.1701(2) provides:
In granting relief provided by subsection (1), if there is a standard for pollution or for an antipollution device or procedure, fixed by rule or otherwise, by the state or an instrumentality, agency, or political subdivision of the state, the court may:
(b) If a court finds a standard to be deficient, direct the adoption of a standard approved and specified by the court.
Thus, in Nemeth v Abonmarche Development, Inc,457 Mich 16; 576 NW2d 641 (1998), we held that a violation of the soil erosion and sedimentation control act (SESCA), MCL 324.9101 et seq., may establish a plaintiffs prima facie showing under MEPA because the SESCA contains a pollution control standard.
MCL 324.1702 is not applicable in this case because, unlike the SESCA, the SDMA does not contain an antipollution standard. Consequently, it is not within the exception created by MCL 324.1701(2). Nemeth, there *517 fore, does not support the argument that a violation of the SDMA may serve as a prima facie violation of MEPA.
The Court of Appeals decision to the contrary was based on a misinterpretation of our holding in Nemeth:
[A]lthough subsection 1701(2) speaks in terms of whether a “standard for pollution or antipollution device or procedure” exists, but does not specifically include whether a standard for impairment or destruction of a natural resource exists, our Supreme Court in Nemeth did not seem to find that to be an important point in that case in which soil erosion, rather than what is commonly thought of as pollution, was at issue. [253 Mich App 263, 286 n 2; 655 NW2d 263 (2002).]
The Court of Appeals conclusion is incorrect. In Nemeth, we expressly justified our holding in part because erosion is a form of pollution. Nemeth, supra at 27 (“Sedimentation and erosion is a [sic] well-recognized source of water pollution.”).
Moreover, in Nemeth, as in all MEPA actions, the focus was on the defendant’s actual conduct.[5] Specifically, this *518 Court reiterated in Nemeth the findings of fact required of a trial court as announced in Ray v Mason Co Drain Comm’r, 393 Mich 294; 224 NW2d 883 (1975). In Ray, we stated:
The trial judge must find the facts on which the plaintiff claims to have made a prima facie case under [§ 1703(1)], namely that the defendant’s conduct “has, or is likely to pollute, impair or destroy the air, water or other natural resources.” ... Obviously the evidence necessary to constitute a prima facie showing will vary with the nature of the alleged environmental degradation involved. [Ray at 309 (some emphasis supplied).]
That the Court of Appeals failed to recognize that MEPA is concerned only with harmful conduct is readily apparent from its characterization of the circuit court’s focus on TechniSand’s mining conduct as error:
Judge Schofield simply addressed whether TechniSand’s proposed mining was likely to “pollute, impair, or destroy” the natural resource in this case — the critical dune area. [253 Mich App 286.]
Plaintiff and the dissent urge us to hold that although TechniSand’s mining operation may or may not be likely to pollute, impair, or destroy the air, water, or other natural resources, its predecessor’s allegedly deficient past relationship to the mining property nega *519 tively affects the environment. We decline their invitation to accept such fuzzy logic. Where a defendant’s conduct itself does not offend MEPA, no MEPA violation exists.
D. REVIEW OF THE DEQ’S MCL 624.63702(1) DECISIONS[6]
We reject the dissent’s gloomy prediction that this orderly understanding of MEPA “insulates [SDMA] permit eligibility determinations from judicial review.” Post at 539.
As previously discussed, DEQ determinations of permit eligibility under §§ 63702(1) and 63704(2) are unrelated to whether the applicant’s proposed activities on the property violate MEPA. Therefore, MEPA provides no private cause of action in circuit court for plaintiffs to challenge the DEQ’s determinations of permit eligibility made under §§ 63702(1) and 63704(2).
An improper administrative decision, standing alone, does not harm the environment. Only -wrongful conduct offends MEPA.
In general, judicial review of an administrative decision is available under the following statutory schemes: (1) the review process prescribed in the statute applicable to the particular agency, (2) an appeal to circuit court pursuant to the Revised Judicature Act (RJA), MCL 600.631, and Michigan Court Rules 7.104(A), 7.101, and 7.103, or (3) the review provided in the Administrative Procedures Act (APA), MCL 24.201 et seq. Palo Group Foster Care, Inc v Dep’t of Social Services, 228 Mich App 140, 145; 577 NW2d 200 (1998).
The SDMA does not expressly establish procedures for disputing a DEQ determination in a contested case *520 unrelated to MEPA. We need not decide here whether PTD’s challenge to the DEQ’s permit decision is governed by the EJA or the APA because the challenge is time-barred under either statute. PTD brought this action nineteen months after the DEQ’s decision to grant TechniSand’s application for an amended permit, which far exceeds the sixty-day period allowed by the APA, MCL 24.304(1), and the twenty-one-day period provided by MCR 7.101(B)(1), which governs appeals under MCL 600.631 of the EJA pursuant to MCR 7.104(A). The DEQ and TechniSand properly interposed this defense in their initial pleadings. Thus, PTD’s claim was time-barred.
E. PARTICIPATION AND INTERVENTION DURING THE PERMIT PROCESS UNDER THE SDMA OR MEPA
Parties who wish to intervene during the permit process have two options. They may intervene either under the procedures governed by the SDMA or those governed by MEPA.
MCL 324.63708(5) of the SDMA establishes a procedure for notifying interested parties of permit applications:
The department shall provide a list of all pending sand dune mining applications upon a request from a person. The list shall give the name and address of each applicant, the legal description of the lands included in the project, and a summary statement of the purpose of the application.
Thus, the SDMA provides a mechanism whereby interested parties may learn of and participate in agency decisions regarding approval of critical dune area mining permits.
MEPA provides another procedure for intervention in permit proceedings. MCL 324.1705(1). This statute *521 requires a potential intervenor to file a pleading asserting that the proceeding or action for judicial review involves conduct that has violated, or is likely to violate, MEPA. Thus, while PTD could have intervened in TechniSand’s permit process under MEPA, its only basis for intervention would have been TechniSand’s proposed conduct. MEPA does not allow such intervention on the basis of anything other than alleged wrongful conduct.
F. REVIEW OF DEQ’S MCL 324.63709 DETERMINATIONS
As already discussed, a challenge under MEPA may be filed in circuit court before or during the time that the alleged MEPA violation occurs, without any requirement that a litigant exhaust administrative remedies. Thus, whether TechniSand was ineligible for the permit under § 63709 on the basis of alleged harmful conduct was a question that was properly before the circuit court. The circuit court ruled against PTD.
The Court of Appeals has not reviewed the circuit court’s decision that TechniSand’s conduct did not violate the MEPA standard incorporated into the SDMA under § 63709. Because the Court of Appeals never reached PTD’s claim that TechniSand’s mining operation violates MEPA, that issue is not ripe for this Court’s review. We remand the case to the Court of Appeals to review the circuit court’s findings regarding TechniSand’s sand mining activity. The Court of Appeals is directed to expedite its consideration of this case.
G. RESPONSE TO THE DISSENT
The dissent initially contends that it is undisputed that TechniSand is “ineligible for a permit.” Post at 525. We disagree. The time for challenging TechniSand’s eligibility for a permit is long past. TechniSand is *522 lawfully entitled to mine sand dunes in Michigan according to the DEQ permit. Whether the DEQ’s permitting decision was “unprincipled” or an “illegal about-face” is not a determination for this Court to make. Post at 525. That decision is time-barred.
The dissent further asserts that the DEQ’s permit decision “will directly enable destruction of critical dunes.” Post at 526 (emphasis supplied). The dissent asserts that critical dunes will be destroyed because the Court of Appeals stated that TechniSand had acknowledged as much in an environmental impact statement. The entire environmental impact statement is not in the record.[7] Moreover, the trial court expressly found to the contrary when it ruled on the MEPA claim. It specifically held that TechniSand’s mining would not destroy a critical dune. The Court of Appeals never addressed this finding.
The dissent’s conclusion that the permitting process is subject to collateral attack is not defensible on the basis of MEPA’s language, structure, or purpose. Countless entities apply for and receive permits for conduct that affects Michigan’s natural resources. Under the dissent’s regime, the permitting decision can never be final. Were we to adopt the dissent’s extreme understanding of MEPA, every permit that has ever been issued would be subject to challenge; any undotted “i” or uncrossed “t” could potentially invalidate an existing permit. We do not believe the Legislature intended MEPA to destabilize the state’s permitting system in this manner.
*523 Imagine the world that the dissent’s reasoning would create. The present energy crisis offers a good example. For many years, our country has sought to decrease our reliance on foreign sources of oil. Suppose an oil company decided to invest in oil exploration in Michigan in reliance on a DEQ-issued permit. Under the dissent’s view, MEPA would authorize a challenge at any time to flaws in the permitting process. Moreover, under the dissent’s reasoning, a court must accept as true the bare assertion that a company’s conduct will destroy natural resources. It can never rely on a permit to do business. What sane investor would take such a risk? As gas prices soar, few people in Michigan would thank this Court for “protecting” the environment in this radical fashion.
The dissent’s regime would render the permitting process a useless exercise. It would cripple economic expansion in Michigan and probably lead to disinvestment. No one would invest money to obtain a permit that is subject to endless collateral attacks.
MEPA nowhere strips the permitting process of finality. It is the dissent that makes a mockery of legislative intent by failing to anchor its exaggerated claims in the statute’s actual language. See post at 526. MEPA does not impose the radical requirement that courts indefinitely police administrative agencies’ permit procedures and decisions. As noted in Oscoda Chapter of PBB Action Comm, Inc v Dep’t of Natural Resources, 403 Mich 215, 232-233; 248 NW2d 240 (1978) (opinion by Levin, J.):
A court is not empowered to prevent any conduct.. . which does not rise to the level of environmental risk proscribed by [MEPA]. The standard, ‘has or is likely to pollute, impair or destroy,’ is a limitation as well as a grant of power.
*524 Moreover, the Court of Appeals never reached the issue of whether TechniSand’s actual conduct is likely to harm natural resources. As already noted, the trial court specifically held that TechniSand’s conduct did not violate MEPA. Given this procedural posture, we are puzzled by the dissent’s statement that defendant’s mining “will” destroy critical dunes.
After taking extensive testimony on the issue, the trial court ruled that any “adverse impact on the environment caused by the mining as permitted will not rise to the level of impairment or destruction within the meaning of MEPA.” The Court of Appeals did not explicitly reject the trial court’s findings. Instead, it erroneously concluded that a permit that affects the environment in any way may be challenged at any time under MEPA. For the reasons articulated above, the Court of Appeals erred in interpreting MEPA in this manner.
CONCLUSION
MEPA affords no basis for judicial review of agency decisions under MCL 324.63702(1) because that inquiry is outside the purview of MEPA. The focus of MEPA is to protect our state’s natural resources from harmful conduct. It offers no basis for invalidating an issued permit for reasons unrelated to the permit holder’s conduct. To hold otherwise would broaden by judicial fiat the scope of MEPA and create a cause of action that has no basis in MEPA’s language or structure.
The Court of Appeals erred by treating PTD’s challenge to TechniSand’s eligibility for a permit under MCL 324.63702(1) as a MEPA claim. Because PTD brought its claim more than nineteen months after the DEQ issued the permit, PTD’s claim is time-barred. We reverse the decision of the Court of Appeals on that issue.
*525 We remand the case to the Court of Appeals to review the circuit court’s findings that TechniSand’s mining conduct does not violate MEPA, and direct the Court of Appeals to expedite its review.
Taylor, Young, and Markman, JJ., concurred with Corrigan, C.J.

 253 Mich App 263; 655 NW2d 263 (2002).

 Ptd is an ad hoc organization of local citizens formed for the purpose of instituting this lawsuit.

 During this time, the DNR was the administrative agency that regulated sand mining. In 1995, this responsibility was transferred from the dnr to the deq by Executive Reorganization Order No. 1995-16 (codified at MCL 324.99903).

 468 Mich 869 (2003).

 Although we held in Nemeth that the sesca creates a pollution control standard applicable to mepa claims, we also specifically stated:
We emphasize that this is not the end of the inquiry. The trial court held that plaintiffs’ showing of defendants’ SESCA violations established a prima facie claim under the mepa. Then, defendants had the opportunity to rebut that prima facie showing either by submitting evidence to the contrary, i.e., that plaintiffs have shown neither pollution, impairment, nor destruction, nor the likelihood thereof, in spite of proof of the sesca violations, or by showing that there is no feasible and prudent alternative to defendants’ conduct. Subsection 1703(1). [Nemeth at 36 n 10 (emphasis added).]
Thus, it is clear that a defendant’s opportunity to rebut a prima facie mepa violation remains the same whether that violation has been established independently or by reference to another statute’s pollution control standard, and that the determinative consideration is whether the defendant’s conduct will, in fact, pollute, impair, or destroy a natural resource. In the instant case, the Court of Appeals erroneously concluded that *518 § 63702 of the SDMA creates a pollution control standard and that defendant violated it. Having so concluded, the Court of Appeals effectively concluded that defendant’s violation of § 63702 amounted to a mepa violation per se. It failed to consider at all whether TechniSand had submitted evidence sufficient to rebut the alleged prima facie mepa violations. The trial court, however, did consider this evidence after finding that PTD presented a prima facie MEPA violation independent of the SDMA. The trial court held that TechniSand had rebutted the prima facie mepa violation. The Court of Appeals failure to consider whether TechniSand could rebut the (erroneously found) prima facie mepa violation evidences the extent to which it improperly failed to consider whether TechniSand’s conduct would actually “pollute, impair, or destroy” a natural resource.

 Ptd does not challenge TechniSand’s satisfaction of the requirements under § 63704(2).

 The excerpt in the record indicates that TechniSand acknowledged that the project would “greatly alter” approximately 61% of the nse. In any case, the trial court expressly found more credible TechniSand’s expert witnesses and ultimately held “the adverse impact on the environment caused by the mining as permitted will not rise to the level of impairment or destruction within the meaning of MEPA.”