DAVIS, J.
In this case we determine whether defendant Merit Energy Company’s plan to discharge contaminated water from an environmental cleanup site in the Manistee River watershed into a previously unpolluted site in the AuSable River watershed is an allowable use of water. We also determine in this case whether the Michigan Department of Environmental Quality (DEQ) (which is now the Department of Natural Resources and Environment) can be sustained as a defendant in an action brought under the Michigan environmental protection act (MEPA), MCL 324.1701 et seq., when the DEQ is alleged to have authorized activity that will harm the environment.
We hold that Merit’s discharge plan is not an allowable use of water because it is manifestly unreasonable, and we further hold that the DEQ can be sustained as a defendant *73 in a MEPA action when the DEQ has issued a permit for activity that it is alleged will cause environmental harm. Accordingly, we reverse the Court of Appeals’judgment in part and remand the case for reinstatement of the trial court’s decision holding the DEQ accountable for violating MEPA.
I. FACTS AND PROCEDURAL HISTORY
This case arises out of Merit’s proposed plan to discharge treated, but still partially contaminated, water from the Manistee River watershed into the AuSable River water system in an effort to clean a plume of contaminated groundwater.
In 2004, Merit acquired the Hayes 22 Central Production Facility (CPF) located in Otsego County, Michigan. As a condition to purchasing the CPF, Merit entered into a settlement agreement with the DEQ to remediate the plume of contaminated groundwater that had originated from the CPE
The exact size of the plume, which at the time was continuing to expand, is unknown. The plume contains benzene, toluene, ethylbenzene, and xylenes and chlorides contained in brine, among other contaminants. The plume is known to have contaminated several residential drinking wells and may have contaminated other residential wells as it continued to expand.
Merit evaluated a number of options for remediation and ultimately chose air stripping — a process that forces a stream of air through water, causing hydrocarbons to evaporate.[1] Merit submitted a corrective action plan to the DEQ to remediate 1.15 million gallons of plume water a day through the use of air stripping.
*74 The plan was to send the 1.15 million gallons a day-through a 1.3-mile pipeline from the air-stripping site to be discharged into Koike Creek. Koike Creek forms the headwater system for the AuSable River watershed. Koike Creek feeds into Bradford Creek, Lynn Lake, and the AuSable River.[2]
The DEQ approved Merit’s corrective action plan and issued a general permit and certificate of coverage allowing discharge of treated water from the air stripper into the wetland area flowing into Koike Creek. The DEQ also granted Merit an easement through state-owned land to allow Merit to construct the pipeline from the air stripper to the discharge point.
Plaintiffs filed a complaint against Merit and the DEQ in the Otsego County Circuit Court. Plaintiffs alleged violations of surface-water law, riparian law, and MEPA. Plaintiffs sought an injunction against the discharge plan.
After a bench trial on plaintiffs’ complaint, the trial court issued an opinion and injunction preventing Merit from discharging the air-stripped water into Koike Creek. The court made detailed findings of fact and concluded that the proposed discharge plan would severely harm the AuSable River water system because of the increased flow of water and the increased level of substances not previously found in Koike Creek.[3] It applied the “reasonable use balancing test” from Mich Citizens for Water Conservation v Nestlé Waters North America Inc, 269 Mich App 25; 709 NW2d 174 (2005).
*75 In applying the reasonable-use balancing test from Nestlé, the trial court concluded that Merit’s proposed amount of discharge constituted an unreasonable use. The court ruled that the proposed discharge, and the DEQ’s authorization of the discharge, violated MEPA. However, in its injunction preventing the discharge, the court left open the possibility that Merit could discharge treated water into Koike Creek at a lower rate that might be considered reasonable under the reasonable-use balancing test.[4]
All parties appealed in the Court of Appeals. In a unanimous opinion, the Court of Appeals affirmed the trial court’s decision regarding the reasonableness of Merit’s proposed discharge plan. Anglers of the AuSable, Inc v Dep’t of Environmental Quality, 283 Mich App 115; 770 NW2d 359 (2009). The Court applied the reasonable-use balancing test and noted that the trial court had left open the possibility that Merit could discharge treated water at a lower, more reasonable rate. Id. at 136-137. The Court of Appeals also unanimously dismissed the DEQ as a defendant, applying this Court’s precedent from Preserve the Dunes, Inc v Dep’t of Environmental Quality, 471 Mich 508; 684 NW2d 847 (2004).
Plaintiffs sought leave to appeal in this Court. We granted leave to appeal, asking the parties to discuss, among other issues, whether Mich Citizens for Water Conservation v Nestlé Waters North America Inc, 479 *76 Mich 280; 737 NW2d 447 (2007), and Preserve the Dunes were correctly decided.[5]
II. STANDARD OF REVIEW
We review a trial court’s factual findings for clear error and its legal conclusions de novo. Hendee v Putnam Twp, 486 Mich 556, 566; 786 NW2d 521 (2010). Whether this Court’s decision in a previous case should be overruled is a question of law that this Court reviews de novo. Bush v Shabahang, 484 Mich 156, 164; 772 NW2d 272 (2009).
III. ANALYSIS
A. PRESERVE THE DUNES v DEP’T OF ENVIRONMENTAL QUALITY
In our order granting leave to appeal, we asked the parties to address whether this Court’s opinion in Preserve the Dunes was correctly decided. After further review of the Preserve the Dunes decision, we conclude that it was decided incorrectly and, accordingly, we overrule it.
Preserve the Dunes involved a group of citizens suing the DEQ for authorizing a permit for a sand dune mining operation[6] in violation of the sand dune mining act (SDMA). MCL 324.63701 et seq. The dune that was to be mined had previously been designated as a protected dune that could not be mined unless one of two exceptions contained in the SDMA applied. The two exceptions were not applicable in that case; therefore, the DEQ’s permit allowing the mining operation on the protected dune violated the law.
*77 The concerned citizens in that case filed a lawsuit against the DEQ under MEPA to protect “the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.” MCL 324.1701(1). The majority in Preserve the Dunes held that reviewing the DEQ’s permit decisions was outside the judicial authority under MEPA. Preserve the Dunes, 471 Mich at 519. The majority noted that MEPA provides for a private cause of action regarding damage to the environment. Id. at 516. The majority stated that the DEQ’s permit application review was based on technical aspects of the application process, and not damage to the environment itself. Id. at 519. The Court concluded that even if violation of the technical aspects of the application process resulted in environmental damage, that level of causation was not grounds for a private cause of action. The Court stated that the permit process was “unrelated” to any subsequent environmental harm caused by the permitted action. Id.
The Preserve the Dunes dissent correctly concluded that the majority’s holding “that permit eligibility is unrelated to whether the conduct permitted will harm the environment is untenable.”[7] Without a permit from the DEQ, a party such as the mining operator in Preserve the Dunes or Merit in the instant case lacks the authority to commence the conduct that will harm the environment. The permit from the DEQ serves as the trigger for the environmental harm to occur. The permit process is entirely related to the environmental harm that flows from an improvidently granted, or unlawful, permit.
Before a majority of this Court decided Preserve the Dunes, this Court had previously decided other cases in *78 which a permit application had been the subject of a MEPA action. Until Preserve the Dunes, this Court had never ruled that a permit decision was insulated from a MEPA action.[8] The majority’s decision in Preserve the Dunes frustrated the legislative intent behind MEPA, and it represented a departure from this Court’s precedent. As the Preserve the Dunes dissent noted:
MEPA is intended to prevent conduct that is likely to harm the environment as well as to stop conduct that is presently harming it. In WMEAC [West Mich Environmental Action Council v Natural Resources Comm, 405 Mich 741; 275 NW2d 538 (1979)], this Court ordered that a permanent injunction be entered prohibiting the drilling of oil and gas wells pursuant to a DNR permit. The “issuance of permits was properly before the circuit court as conduct alleged to be likely to pollute, impair, or destroy” natural resources under MEPA. WMEAC at 751. The drilling would cause “apparently serious and lasting, though unquantifiable, damage” to elk herd population. WMEAC at 760. This Court concluded that the previous MEPA, MCL 691.1203(1), is violated whenever the effects of permit issuance harm the environment to the requisite degree. WMEAC at 751, 760. [Preserve the Dunes, 471 Mich at 534 (Kelly, J., dissenting).]
Because the Preserve the Dunes opinion violated the legislative intent behind MEPA, and because the opinion conflicted with this Court’s caselaw that came before it, we hold that Preserve the Dunes was incorrectly decided to the extent that it insulated the DEQ’s permit application process from review under MEPA.
There are further compelling justifications for overruling Preserve the Dunes. The first is that MEPA is a *79 statute that was enacted as part of the environmental protection mandate to the Legislature contained in Article 4, § 52 of Michigan’s Constitution. In Ray v Mason Co Drain Comm’r, 393 Mich 294, 304-306; 224 NW2d 883 (1975), this Court stated:
Michigan’s Environmental Protection Act marks the Legislature’s response to our constitutional commitment to the “conservation and development of the natural resources of the state...” Const 1963, art 4, § 52 in its entirety reads:
“Section 52. The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction.” (Emphasis added.)
Michigan’s EPA was the first legislation of its kind and has attracted worldwide attention. The act also has served as a model for other states in formulating environmental legislation. The enactment of the EPA signals a dramatic change from the practice where the important task of environmental law enforcement was left to administrative agencies without the opportunity for participation by individuals or groups of citizens. Not every public agency proved to be diligent and dedicated defenders of the environment. The EPA has provided a sizable share of the initiative for environmental law enforcement for that segment of society most directly affected — the public.
The act provides private individuals and other legal entities with standing to maintain actions in the circuit courts for declaratory and other equitable relief against anyone “for the protection of the air, water and other natural resources and the public trust therein from pollution, impairment or destruction”. MCLA 691.1202(1); MSA 14.528(202X1).
*80 But the EPA does more than give standing to the public and grant equitable powers to the circuit courts, it also imposes a duty on individuals and organizations both in the public and private sectors to prevent or minimize degradation of the environment which is caused or is likely to be caused by their activities. [Emphasis added and citations omitted.]
The majority’s decision in Preserve the Dunes not only violated the Legislature’s intent to protect the environment encapsulated in MEPA, it subverted the people’s will as expressed in Michigan’s constitutional requirement that the Legislature “shall” protect the environment.
Another compelling reason for overruling Preserve the Dunes is that it appears from the instant case that the DEQ has done more than simply issue a permit that would result in the harm of natural resources. It has also granted an easement over state land to facilitate the harmful actions. Under Preserve the Dunes, the DEQ cannot be required to account for its actions. By overruling Preserve the Dunes, this Court can restore the accountability that was intended under MEPA.
Because the Preserve the Dunes decision to insulate DEQ permit decisions from MEPA violated the Legislative intent behind MEPA, conflicted with previous caselaw regarding MEPA, and subverted the will of the people contained in article 4 of Michigan’s constitution, we overrule it.[9]
*81 B. NESTLÉ AND STANDING
In the order granting leave to appeal, we also asked the parties to brief whether Nestlé was correctly decided.[10] However, Nestlé has already been overruled in part.
One of the issues in Nestlé was whether the plaintiffs had standing to appear in court to protect property from being affected by the defendant’s pumping of groundwater that it intended to bottle and sell. At the time, a majority of this Court held that the plaintiffs only had standing with respect to property that they owned or used, no more. Nestlé, 479 Mich at 285. The majority relied on the theory of standing adopted in Lee v Macomb Co Bd of Comm’rs, 464 Mich 726; 629 NW2d 900 (2001). Nestlé, 479 Mich at 294-295. But this Court has recently explained that statutes granting standing should be applied as written, thus overruling the standing doctrine adopted in Lee and followed in Nestlé. Lansing Sch Ed Ass’n v Lansing Bd of Ed, 487 Mich 349, 371 & n 18; 792 NW2d 686 (2010) (LSEA). Accordingly, MEPA, which specifies that “any person may maintain an action . . . against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, *82 impairment, or destruction,” should be applied as it is written. MCL 324.1701(1) (emphasis added).
We therefore need not address the standing issue from Nestlé. Plaintiffs in this case have interests that differ from the citizenry at large.[11] LSEA, 487 Mich at 359. And, even if they did not, it is clear that under MEPA “any person” has standing to maintain an action protecting Michigan’s natural resources; indeed, the Attorney General admitted at oral argument that that was the state’s position as well. Because plaintiffs most certainly qualify under the statute’s designation of “any person,” plaintiffs would have standing regardless of this Court’s decision in Nestlé.
C. REASONABLENESS OF THE PROPOSED KOLKE CREEK DISCHARGE
Nonetheless, this Court’s decision to overrule Nestlé in LSEA did not affect the reasonable-use balancing test. In its Nestlé opinion, this Court explicitly declined to “pass on the merits” of, among other things, the “reasonable use balancing test” that had been applied by the Court of Appeals.[12] Thus, this Court has not passed judgment on the merits of that test.
The parties have agreed that the reasonableness of the water’s use is the determining factor in deciding water-use cases,[13] and they have also all noted that the facts in this case are distinguishable from those in *83 Nestlé. In Nestlé, the diverted water was potable water being pumped out of the ground, packaged, and sold in many locations in and out of Michigan. In the instant case, contaminated water is being pumped from the ground in one watershed, treated and stripped of hydrocarbons but not fully decontaminated, and then pumped as surface water into a separate, previously uncontaminated watershed.
Plaintiffs focus much of their attention on the seminal Michigan water-law case of Dumont v Kellogg, 29 Mich 420 (1874), and its progeny[14] for the proposition that water cannot be diverted for an unreasonable use that would damage a riparian owner’s use of the waterway. While it is true that Michigan courts have held that water should generally not be diverted from a watershed, we find that argument unpersuasive here. We distinguish Dumont and its progeny on the facts of this case.
Plaintiffs are seeking to protect the AuSable River watershed. Water is not being diverted from the AuSable River watershed in this case. The water that is being diverted is coming from the Manistee River watershed, and the reasonableness of merely diverting water out of the Manistee River watershed is not at issue. Thus, the cases that plaintiffs cite are not helpful on these facts.
It is clear from this Court’s water-law precedent cited in both sides’ briefs that an unreasonable use of water has never been deemed an allowable use and is not now an allowable use.[15] Defendants have presented no au *84 thority for the proposition that the diversion of contaminated water from one source to an uncontaminated watershed should be considered reasonable. It would be incongruous to hold that it is reasonable to decontaminate water by contaminating different water.[16]
Furthermore, it would be unconscionable and destructive for this Court to determine that it is reasonable to spread dangerous contamination throughout Michigan as we have described. The necessarily resulting harm would be spread not only to immediate downstream users but, in the end, to anyone in Michigan who relies, directly or indirectly, on our state’s water remaining clean.
Accordingly, we affirm the lower courts’ rulings preventing Merit’s proposed discharge from the CPF into Koike Creek.[17]
IV CONCLUSION
We hold that Merit’s discharge plan is not an allowable use of water because it is manifestly unreasonable. We hold that the DEQ can be sustained as a defendant in a MEPA action for its permitting decisions. We uphold the lower courts’ determination that the proposed discharge plan is unreasonable, and we remand the case for reinstatement of the trial court’s decision holding the DEQ accountable for violating MEPA.
*85 Affirmed in part, reversed in part, and remanded.
Hathaway, J., concurred with Davis, J.

 The air-stripping process does not remove any brines or chlorides from the water. Thus, although the water is cleaner at discharge than when it was first removed from the ground at the CPF, the water remains contaminated in some respects.

 The plaintiffs in this case are either riparian owners along these waterways or users of the waterways for recreational purposes such as fishing. The waterways are considered prime trout-fishing locations because of their purity and mineral content.

 The trial court also made findings about whether Merit had properly obtained rights to discharge the treated water through the state-land easement. However, because we do not find those issues to be outcome-determinative in this appeal, we will not address them in this opinion.

 Merit contends that this case is now moot because it has abandoned the Koike Creek discharge plan and is instead treating the CPF contamination plume through another method. However, as correctly argued by the plaintiffs, the trial court has left open the door for Merit to discharge treated water into Koike Creek at a lower than originally proposed rate. Because there is still a court order keeping the Koike Creek discharge plan alive, we cannot treat this case as moot.

 Anglers of the AuSable, Inc v Dep’t of Environmental Quality, 485 Mich 1067 (2010).

 The mining operation was also sued, but the focus relevant to this case is the suit against the DEQ.

 Id. at 533-534 (Kelly, J., dissenting).

 See, e.g., Eyde v Michigan, 393 Mich 453, 454; 225 NW2d 1 (1975), Ray v Mason Co Drain Comm’r, 393 Mich 294, 304-305; 224 NW2d 883 (1975), West Mich Environmental Action Council v Natural Resources Comm, 405 Mich 741, 751; 275 NW2d 538 (1979), and Nemeth v Abonmarche Dev, Inc, 457 Mich 16; 576 NW2d 641 (1998).

 We do not overrule Preserve the Dunes without proper consideration of the principle of stare decisis. The approach taken to stare decisis in any-given case will be dependent on the facts and circumstances presented. See Planned Parenthood of Southeastern Pennsylvania v Casey, 505 US 833, 854-855; 112 S Ct 2791; 120 L Ed 2d 674 (1992). Historically, many different approaches to stare decisis have been taken. See Petersen v Magna Corp, 484 Mich 300; 773 NW2d 564 (2009); Univ of Mich Regents v Titan Ins Co, 487 Mich 289, 314-317; 791 NW2d 897 (2010) (Hathaway, J., concurring). The *81 reasons given in Justice Kelly’s dissent in Preserve the Dunes, and the further reasons given in this opinion, make clear that Preserve the Dunes must be overruled and the law must be returned to how it was applied before Preserve the Dunes was incorrectly decided.

 We also asked the parties to brief whether an easement could grant Merit riparian rights on land the state of Michigan owned. Under Thompson v Enz, 379 Mich 667; 154 NW2d 473 (1967), and its progeny, including Little v Kin, 249 Mich App 502; 644 NW2d 375 (2002), riparian rights may he conveyed to a nonriparian landowner by easement under certain circumstances. However, even assuming arguendo that the proposed easement in this case is valid, we conclude that the proposed use is unreasonable. Thus, it is unnecessary to consider this issue further.

 Plaintiffs use or own property along waterways that would be affected under Merit’s proposed discharge plan.

 Nestlé, 479 Mich at 289 n 12, 291.

 While the parties agree that the reasonableness of the water’s use is the determining factor in deciding water-use cases, they do not agree on using the “reasonable use balancing test” from Nestlé. We do not pass judgment on that test in this case because, under any test and by any standard, the discharge plan at issue is manifestly unreasonable.

 Hall v City of Ionia, 38 Mich 493 (1878); Kennedy v Niles Water Supply Co, 173 Mich 474; 139 NW 241 (1913); Hoover v Crane, 362 Mich 36; 106 NW2d 563 (1960).

 The cases cited include Dumont; Hall; Schenk v City of Ann Arbor, 196 Mich 75; 163 NW 109 (1917); Kennedy, and Hoover.

 We do not hold that diverting water from one watershed to another is ipso facto unreasonable. Our concern today is with the discharge of contaminated water into an uncontaminated watershed.

 In reaching this decision, it is important to note that we focus our ruling on the reasonableness of using Koike Creek as a discharge point for contaminated water removed from a separate watershed. We are not basing this decision on Merit’s status as a riparian or groundwater user. We are not basing this decision on Merit’s status as an off-tract or on-tract water user. And we are not basing this decision on the fact that Merit is seeking to divert water out of the Manistee River watershed.