746 N.W.2d 320 (2007)
MICHIGAN BEAR HUNTERS ASSOCIATION, INC., Plaintiff-Appellee, and
Michigan State United Coon Hunters Association, Michigan Hunting Dog Federation, and Upper Peninsula Bear Houndsmen Association, Intervening Plaintiffs-Appellees
v.
MICHIGAN NATURAL RESOURCES COMMISSION and Department of Natural Resources, Defendants-Appellants.
Michigan Bear Hunters Association, Plaintiff-Appellee, and
Michigan State United Coon Hunters Association, Michigan Hunting Dog Federation, and Upper Peninsula Bear Houndsmen Association, Intervening Plaintiffs-Appellees,
v.
Michigan Natural Resources Commission and Department of Natural Resources, Defendants-Appellants.
Docket Nos. 270745, 274429.
Court of Appeals of Michigan.
Submitted November 14, 2007, at Lansing.
Decided November 20, 2007.
Approved for Publication January 15, 2008, at 9:05 a.m.
Released for Publication March 14, 2008.
*321 Dilley Haney, P.C. (by Frederick D. Dilley) (Robert J. Riley, of counsel), Grand Rapids, for Michigan Bear Hunters Association, Inc.
Michael A. Cox, Attorney General, Thomas L. Casey, Solicitor General, and Sara R. Gosman and Elaine Dierwa Fischoff, Assistant Attorneys General, for the Natural Resources Commission and the Department of Natural Resources.
Before: OWENS, P.J., and BANDSTRA and DAVIS, JJ.
PER CURIAM.
Plaintiff Michigan Bear Hunters Association, Inc. (MBHA), and intervening plaintiffs Michigan State United Coon Hunters Association, Michigan Hunting Dog Federation, and Upper Peninsula Bear Houndsmen Association filed an action to enjoin a bobcat-trapping season in the Northern Lower Peninsula (NLP) implemented by defendants Michigan Department of Natural Resources (DNR) and Michigan Natural Resources Commission (NRC). After a bench trial, Ingham Circuit Judge Beverley Nettles-Nickerson reversed defendants' decision implementing a bobcat-trapping season in the NLP and permanently enjoined the bobcat-trapping season. Defendants brought separate appeals from the trial court's judgment and order and from the order awarding costs and fees to the plaintiffs. This Court consolidated the appeals. We reverse the judgment and order, vacate certain findings of fact by the trial court, remand for further proceedings, and vacate the order awarding costs and fees.

I. Facts and Procedural History
The bobcat is a North American member of the cat family, weighing between 15 and 30 pounds and measuring between 40 and 50 inches in length and 20 inches in height at the shoulder. Bobcats are a generalist species, meaning that they live in a wide variety of habitats and have a range of food sources. Bobcats are not endangered either in the United States or in Michigan.
In Michigan, bobcats live throughout the Upper Peninsula (UP) and in the Lower Peninsula, except for the thumb region and portions of the southeastern part of the state. They are more common in the northern part of the Lower Peninsula than *322 in the southern part, because the NLP has a more-suitable habitat. According to Thomas Gehring, a wildlife biologist at Central Michigan University, the NLP is a high-quality habitat for bobcats because it has extensive lowland conifers, cedar swamps, and forests with an abundance of prey, especially snowshoe hare, a preferred food source for bobcats. Further, Gehring explained, the NLP receives less snow than bobcat habitats further north, and the forested areas in which these bobcats live provide protection from some extremes in temperature.
Bobcats throughout the United States are part of the same species and can interbreed. Although bobcats in the NLP exhibit the same amount of genetic variation throughout their range, genetic differences have been discovered between bobcats of the UP and the NLP. Because the UP and the NLP are separated by the Great Lakes, there is little interaction between these populations. However, debate exists regarding the vulnerability of the NLP bobcat population and the extent to which bobcats enter the NLP from the south. Michael Tewes, a wildlife biology professor from Texas A & M University-Kingsville, claimed that bobcats in the NLP are on the fringe of their range. He opined that the NLP bobcat population is vulnerable because it is a small, isolated population and does not receive demographic or genetic input from other bobcat populations.
Gehring agreed that bobcats in the NLP are at the edge of their habitat range, but he hesitated to characterize the NLP bobcat population as fragile, explaining that NLP bobcats live in a high-quality habitat. Gehring also noted that bobcats from populations located in Illinois, Indiana, and Ohio could move into the NLP, establishing ranges in the NLP and interbreeding with NLP bobcats.
Although he did not agree that the NLP is at the fringe of the bobcat range, Dwayne Etter, a wildlife research specialist with the DNR, concurred that the bobcat habitat in the NLP is not fragile. He explained:
Typically discussions of whether species exist on the fringe means that you're at a very, very maximum extent of the range of the species. Usually there's some type of limiting factor. For the bobcat there it's probably snowfall depth would limit that species to exist farther north. We are not at the far north extent of the bobcat range and we also have no indication that bobcat are not doing well in this part of the country. Typical indication of a species that was at the northern extent of a range would be something that wasn't doing well reproducing or had low survivorship or something like that, but we don't see that with bobcat in Michigan.
Etter also agreed with Gehring's assessment that genetic and demographic exchange occurred between NLP bobcats and bobcats from populations further south.
To facilitate the management of bobcat hunting and trapping throughout the state, the DNR divided the state into five bobcat-management units. In Zones A and B, which comprise the UP, bobcat hunting is permitted between December 1 and March 1, and bobcat trapping is permitted between October 25 and March 1. The Lower Peninsula is divided into three management units: (1) Unit C, which is comprised of Emmet, Charlevoix, Antrim, Otsego, Cheboygan, Presque Isle, Montmorency, Alpena, Oscoda, and Alcona counties; (2) Unit D, which is comprised of Kalkaska, Crawford, Wexford, Missaukee, Roscommon, Ogemaw, Iosco, Osceola, Clare, and Gladwin counties and part of Arenac County; and (3) Unit E, which is comprised of *323 the rest of the Lower Peninsula. Bobcat hunting is permitted in Unit C between January 1 and March 1 and in Unit D between January 1 and February 1.
When the state initially permitted bobcat hunting and trapping, no limit was placed on the number of bobcats that could be harvested. However, as concerns of overharvesting developed, the DNR began implementing bag limits on hunters and trappers. At the time the order at issue in this case was implemented, and through the present day, the DNR has limited each person to a total harvest of two bobcats each season (whether taken by hunting or by trapping). However, each hunter or trapper is only allowed to harvest one bobcat from bobcat-management units C and D combined.[1] In addition, any licensed fur harvester intending to harvest a bobcat must first obtain a bobcat kill tag from the DNR. When the fur harvester captures and kills a bobcat, he or she must immediately attach the kill tag to the carcass. The fur harvested then must register the bobcat with the DNR.
Throughout the latter half of the 20th century, the DNR did not permit bobcat trapping in the NLP. In June 2004, the NRC issued an order establishing a limited bobcat-trapping season in the NLP. According to the order, trapping would be permitted in bobcat-management units C and D between December 10 and December 20. In September 2004, the NRC amended this order to limit bobcat trapping in units C and D to private lands and to require trappers to only use a live-restraint trap known as a foothold trap.
As Etter explained at trial, the DNR used a process called adaptive management to monitor the effect of this order on the NLP bobcat population and adjust hunting and trapping regulations in the state as necessary to counteract decreases in population. If the trend indices and other data monitored by the DNR indicated that the bobcat population is decreasing, Etter explained, the DNR could issue an order shortening a hunting or trapping season, closing certain areas to hunting or trapping, or closing an entire hunting or trapping season.[2]
Etter also noted that the DNR uses a variety of data to monitor the bobcat population in the state, including population indices, harvest registration information, ongoing research studies, and radiotelemetry studies. He acknowledged that the DNR had not calculated a population estimate of bobcats, either in the NLP or statewide, because bobcats are secretive animals and difficult to count. Instead, he explained, the DNR uses trend indices to monitor changes in the bobcat population.[3] Regardless, Etter estimated that there were as many as 3,300 bobcats in the NLP and noted that bobcats could suffer a harvest rate of up to 20 percent and still maintain their population. Conversely, Tewes estimated that the size of the NLP population was 1,794 bobcats and opined that because of the population's fragility, NLP bobcats could only maintain their *324 population if they suffered a harvest rate of no more than 15 percent.
After the 2004 NLP bobcat-trapping season ended, the DNR sent a survey to the 2,180 individuals who obtained a bobcat-harvest permit before the end of the 2004 trapping season. After compiling the survey data and making appropriate statistical adjustments, it made the following findings:
In 2004, 2,180 furtakers obtained a bobcat harvest permit before December 21 allowing them to trap bobcats in the NLP. About 15% of these people attempted to trap bobcats in the NLP (326 trappers). Trappers spent nearly 2,750 days trapping bobcats, captured an estimated 151 bobcats, and released 68 of these bobcats alive. About 30% of the trappers captured at least one bobcat. About 51% of the successful trappers reported it was likely they would have attempted to take a bobcat in the NLP while hunting if they had not already trapped a bobcat. About 50% of the trappers believed bobcat numbers were increasing in counties where they trapped in the NLP, while 31% believed numbers were stable and 5% thought bobcat numbers were declining. About 93% of trappers reported they were very likely or somewhat likely to continue trapping bobcats during the next five years in the NLP.
DNR registration data indicated that the registered harvest from the 2004-2005 bobcat hunting and trapping seasons in the NLP was 265 bobcats. Of this total, 197 registered bobcats were harvested by hunting and 68 registered bobcats were harvested by trapping.
The number of bobcats harvested by both hunting and trapping in the NLP in 2004 was within one standard deviation of the number of bobcats harvested by hunting alone between 1998 and 2002.[4] At trial, Etter maintained that the NLP bobcat harvest remained relatively consistent between 1985 and 2004. Further, he noted that at the time he testified (two weeks before the opening of trapping season in the NLP), requests for bobcat-harvest permits were 15 percent lower than they had been at the same time the previous year, indicating that the bobcat harvest might decrease in the 2005-2006 season. Etter opined that the "limited bobcat trapping season in the [NLP] established by the [NRC] did not impair the bobcat population because the population is sustainable. The bobcat population is used (harvested) in such a manner that the resource is not depleted or permanently damaged."
Tewes, however, viewed this data differently. He noted that although the average yearly harvest in the NLP over the past four years (2001-2004) had been approximately 253 bobcats, the average yearly harvest over the four years preceding those four years (1997-2000) was approximately 176 bobcats. Overall, he concluded, this data indicated that the bobcat harvest was increasing. Tewes also concluded that the data on harvest catch per unit effort, which measures the number of days spent hunting for each bobcat caught, indicated that the bobcat population was decreasing. He noted that in the 2001-2002 hunting season, it took a hunter 21 days to catch a bobcat, while in the 2003-2004 hunting season it took a hunter 59 days and in the 2004-2005 hunting season it took a hunter 56 days to catch a bobcat. Tewes explained that this data indicated that hunters were spending more time hunting for bobcats because the bobcat *325 population had decreased. After considering this and other data, he concluded that trapping was impairing the NLP bobcat population.
However, Etter disagreed with Tewes's assertion that this statistical trend in harvest catch per unit effort was significant. In particular, he noted that the statistics on harvest catch per unit effort were compiled from different data sets: the statistics before the 2003-2004 hunting season were compiled from statewide data that did not distinguish between the UP and the NLP, while the statistics on harvest catch per unit effort that Tewes considered from the 2003-2004 and 2004-2005 hunting seasons were compiled from data specific to the NLP. He explained that making a conclusion about trends in the NLP bobcat population from statewide data would not be acceptable in the scientific community because the bobcat populations in the NLP and the UP have different habitats, population densities, and hunting regulations, skewing the statewide data.
After considering the evidence presented, the circuit court reversed the NRC's decision to permit a bobcat-trapping season in the NLP and permanently enjoined defendants from sanctioning a bobcat-trapping season in the NLP until the NRC complied with MCL 324.1703 and MCL 324.40113a. The court stated:
In the present case, this Court finds that Plaintiffs have demonstrated that Defendants' decision to sanction a bobcat trapping season in the NLP is likely to impair the bobcat population. The bobcat harvest for the last six seasons averaged two hundred thirty-seven (237) bobcats which is demonstratively higher than the previous 10-year average of one hundred seventy-five (175). Hunter success, which is measured by catch per unit effort, has increased from twenty (20) days to kill a bobcat in 1998 to approximately fifty-six (56) days. This Court finds that a rising harvest of bobcats in conjunction with an attendant falling catch per unit effort are indicative of a decreasing bobcat population and is symptomatic of over-harvesting. Plaintiffs have presented a prima facie showing of likely impairment of the bobcat resource.
Having made a prima facie showing of likely impairment Defendants have the burden to provide a feasible and prudent alternative to protect the bobcat resource from impairment or destruction. MCL 324.1703(1). The evidence presented indicate the response by the vast majority of the Wildlife Management Unit Supervisors, to the proposal of allowing a bobcat trapping season in the NLP, did not support the addition of trapping in the NLP. Only one of the eight Management Unit Supervisors recommended a limited trapping season. Defendants ignored the increase [sic, increased] bobcat harvest, the decrease in hunter success, and the overwhelming opinion against a bobcat trapping season in the NLP. Defendants have not demonstrated a prudent alternative to protect the bobcat resource from impairment or destruction. [Emphasis in original.]
The court also determined that defendants failed to exercise sound scientific management when implementing the NLP bobcat-trapping season. It reversed defendants' decision implementing a bobcat-trapping season in the NLP and permanently enjoined the bobcat-trapping season. The court also awarded plaintiffs $130 in nominal costs pursuant to MCL 600.2441 and $8,500 in expert-witness fees pursuant to MCR 2.625(G)(3).

II. Jurisdiction
In count I of their complaint, plaintiffs argue that defendants violated MCL *326 324.40113a(2) when they failed to use principles of sound scientific management when issuing an order permitting bobcat trapping in the NLP. We conclude that the circuit court did not have jurisdiction to hear this action. MCL 324.40113a(2) states, in relevant part:
The commission of natural resources shall have the exclusive authority to regulate the taking of game as defined in section 40103 in this state.[[5]] The commission of natural resources shall, to the greatest extent practicable, utilize principles of sound scientific management in making decisions regarding the taking of game. Issuance of orders by the commission of natural resources regarding the taking of game shall be made following a public meeting and an opportunity for public input.
The NRC is part of the DNR and, therefore, is an administrative body. See MCL 324.501. In Hopkins v. Parole Bd., 237 Mich.App. 629, 637-638, 604 N.W.2d 686 (1999), this Court stated:
Generally, three potential avenues of review exist by which an aggrieved party may challenge an administrative body's decision: (1) review pursuant to a procedure specified in a statute applicable to the particular agency, (2) the method of review for contested cases under the Administrative Procedures Act (APA), MCL 24.201 et seq. . . . or (3) an appeal pursuant to § 631 of the Revised Judicature Act, MCL 600.631 . . . and Const. 1963, art. 6, § 28, in conjunction with MCR 7.104(A).
MCL 324.40101 et seq., which concerns the management and conservation of wildlife, does not specify a method for review of an NRC decision regarding game management. Accordingly, review of the DNR's decision may only be pursued according to the provisions of either the APA or the Revised Judicature Act.
Significantly, however, plaintiffs did not request in their complaint that the circuit court review the DNR's trapping order pursuant to the APA, the Revised Judicature Act, or any other method. After defendants unsuccessfully challenged count I of plaintiffs' complaint on the ground that the circuit court lacked subject-matter jurisdiction, plaintiffs amended their complaint, apparently to assert in count I that MCL 324.1705 provides a cause of action under which plaintiffs could challenge defendants' alleged violation of MCL 324.40113a.[6] However, the provisions of MCL 324.1705 only address intervention in administrative, licensing, and other proceedings and judicial review of these proceedings, and do not provide a means to bring an independent action in the circuit court. Plaintiffs fail to provide any indication that the circuit court had subject-matter jurisdiction to address their original action alleging that defendants failed to use "sound scientific management" when implementing the bobcat-trapping order.
Further, in response to defendants' argument that the circuit court did not have subject-matter jurisdiction over count I, plaintiffs acknowledged, "the present case is not a mere `review' proceeding at all, but is instead a direct `action in the circuit *327 court' brought by plaintiff, as expressly authorized by MCL 324.1701, to redress the failure of defendants to discharge their duty to preserve the bobcat resource." (Emphasis in original.) Essentially, plaintiffs have attempted to preserve their claim that defendants failed to use sound scientific management when implementing the bobcat-trapping order as an independent action in the circuit court by redefining their cause of action as one alleging a violation of MCL 324.1701. However, plaintiffs alleged a violation of MCL 324.1701 in count II of their complaint. Apparently, plaintiffs believe that count I and count II are different, although they both allege that defendants violated MCL 324.1701 by implementing the bobcat-trapping order in the NLP, because count I challenges the soundness of the method that defendants used to implement this order, while count II challenges the effect that this order would have on the bobcat population. However, this is a distinction without a difference. MCL 324.1701(1) states:
The attorney general or any person may maintain an action in the circuit court having jurisdiction where the alleged violation occurred or is likely to occur for declaratory and equitable relief against any person for the protection of the air, water, and other natural resources and the public trust in these resources from pollution, impairment, or destruction.
MCL 324.1701(1) does not differentiate between the method by which an order has been issued and the effect of this order on a particular resource; instead, the statute permits any person to maintain an action against any person (including the DNR) in order to protect a natural resource "from pollution, impairment, or destruction."[7] Accordingly, plaintiffs have alleged one cause of action against defendants over which the circuit court has jurisdiction, namely, that defendants' issuance of an order permitting bobcat trapping in the NLP has resulted in, or is likely to result in, the impairment or destruction of the bobcat resource. To the extent that court I raises an original cause of action alleging violation of MCL 324.40113a(2), the circuit court lacks the jurisdiction to hear it.

III. NREPA Application
Defendants argue that the circuit court incorrectly applied the provisions of the Natural Resources and Environmental Protection Act (NREPA) to the facts of this case. We agree. We review de novo whether the circuit court properly applied the NREPA. Preserve the Dunes, Inc. v. Dep't of Environmental Quality (On Remand), 264 Mich.App. 257, 259, 690 N.W.2d 487 (2004).
As discussed earlier, MCL 324.1701(1) permits plaintiffs to maintain an action against the DNR in order to protect a natural resource "from pollution, impairment, or destruction." Again, plaintiffs can establish a violation of MCL 324.1701(1), and receive equitable relief by way of enjoinment of the bobcat-trapping season, if sufficient evidence presented before the circuit court establishes that the NLP bobcat-trapping order has caused, or is likely to cause, the impairment or destruction of the NLP bobcat population. MCL 324.1703(1) describes the burden of proof placed on each party to establish or rebut the allegation that a natural resource has been, or is likely to be, impaired or destroyed:

*328 When the plaintiff in the action has made a prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative to defendant's conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction. Except as to the affirmative defense, the principles of burden of proof and weight of the evidence generally applicable in civil actions in the circuit courts apply to actions brought under this part.
"`[A] plaintiff has established a prima facie case when his case is sufficient to withstand a motion by the defendant that the judge direct a verdict in the defendant's favor.'" City of Jackson v. Thompson-McCully Co., LLC, 239 Mich.App. 482, 488, 608 N.W.2d 531 (2000), quoting Nemeth v. Abonmarche Dev., Inc., 457 Mich. 16, 25, 576 N.W.2d 641 (1998).
When the circuit court issued its findings of fact and conclusions of law, it concluded that plaintiffs presented a prima facie showing of likely impairment to the bobcat resource, because they presented evidence of "a rising harvest of bobcats in conjunction with an attendant falling catch per unit effort," which the court concluded was "indicative of a decreasing bobcat population and [] symptomatic of over-harvesting." The circuit court also determined that defendants failed to provide sufficient evidence to establish that no feasible and prudent alternative existed to protect the bobcat resource from impairment or destruction and, therefore, failed to rebut the presumption that the issuance of the NLP bobcat-trapping order impaired the bobcat population in the NLP.[8] However, the circuit court incorrectly applied the provisions of MCL 324.1703(1) when making this ruling. Assuming, without deciding, that plaintiffs made a prima facie showing of likely impairment, defendants still did not "have the burden to provide a feasible and prudent alternative to protect the bobcat resource from impairment or destruction," as the circuit court erroneously concluded. The statute plainly states that "[t]he defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative to defendant's conduct. . . ." The statute does not require defendants to establish that no feasible and prudent alternative to protect the bobcat resource exists in order to rebut plaintiffs' prima facie showing of actual or likely impairment. Instead, the statute permits (but does not require) defendants to present as an affirmative defense evidence indicating that "there is no feasible and prudent alternative to defendant's conduct and that [their] conduct is consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction." Accordingly, the circuit court's holding that defendants failed to rebut plaintiffs' prima facie showing of likely impairment of the bobcat resource by providing a feasible and prudent alternative *329 to protect the bobcat population from impairment is erroneous.
Instead, MCL 324.1703(1) clearly states that in the event that plaintiffs make a prima facie showing of actual or likely impairment or destruction, "the defendant may rebut the prima facie showing by the submission of evidence to the contrary." At trial, defendants presented substantial evidence indicating that the NLP bobcat-trapping order did not and was not likely to impair the bobcat population. In particular, defendants presented evidence that the harvest of bobcats by both hunting and trapping in 2004 was within one standard deviation of the number of bobcats harvested by hunting alone between 1998 and 2002, indicating that the NLP bobcat harvest remained relatively consistent even after the opening of the trapping season. Defendants also presented evidence indicating that the data on harvest catch per unit effort that the circuit court noted in its opinion were skewed. However, the circuit court made no indication in its opinion and order that it considered whether this evidence rebutted what it found to be plaintiffs' prima facie showing of actual or likely impairment.
Basically, the circuit court failed to apply the plain language of MCL 324.1703(1) when issuing its ruling in this case. Although the circuit court recognized that plaintiffs had the initial burden to make a prima facie showing that defendants' conduct "polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the public trust in these resources," it failed to recognize that defendants could rebut this prima facie showing "by the submission of evidence to the contrary." Further, the circuit court imposed on defendants the burden to provide a feasible and prudent alternative to protect the bobcat resource from impairment or destruction in order to rebut plaintiffs' purported prima facie showing of actual or likely impairment, although this requirement is not found in the statute. Accordingly, we reverse the circuit court's judgment and order and remand this case for further proceedings.
The circuit court also found that, "at the time Defendants made the decision in 2004 to allow a bobcat-trapping season in the NLP, they failed to exercise sound scientific management." Yet plaintiffs do not have a cause of action against defendants based on a violation of MCL 324.40113a(2). Accordingly, the circuit court erred when it made findings of fact regarding whether defendants exercised sound scientific management when they implemented the bobcat-trapping order, and these findings are vacated.
Because plaintiffs are no longer the prevailing parties in this action, their award of costs and fees is vacated, and we will not address defendants' allegations of error with regard to this award.
Reversed and remanded for proceedings consistent with this opinion. Certain findings of fact by the trial court and the award of costs and fees are vacated. We do not retain jurisdiction.
NOTES
[1] This means that a hunter/trapper can harvest two bobcats in the UP or harvest one bobcat in the UP and one bobcat in the NLP.
[2] This would mean that if bobcats were overharvested during trapping season, the DNR might have to issue an emergency order to close bobcat-hunting season, and members of plaintiffs' organizations would not be able to hunt bobcats.
[3] Trend indices are tools developed by wildlife biologists to estimate the relative abundance of a population and whether that population is stable, increasing, or decreasing. According to Etter, many states use trend indices to track the population of bobcats.
[4] In the NLP, the registered bobcat harvest between 1998 and 2004 was as follows: 162 harvested in 1998, 217 harvested in 1999, 190 harvested in 2000, 248 harvested in 2001, 296 harvested in 2002, 205 harvested in 2003, and 265 harvested in 2004.
[5] "Game," as defined in MCL 324.40103(1), includes bobcats.
[6] Plaintiffs amended count I of their original complaint to allege that defendants' failures to "utilize principles of sound scientific management in making decisions regarding the taking of bobcats by trapping in the [NLP] and otherwise making management decisions concerning the Michigan bobcat population constitute separate violations of the substantive and procedural duties imposed by the Michigan Environmental Protection Act (MCLA 324.1705; NREPA Part 401). . . ."
[7] MCL 324.301(h) defines "person," as used in the Natural Resources and Environmental Protection Act, as "an individual, partnership, corporation, association, governmental entity, or other legal entity."
[8] For purposes of this opinion, we assume that plaintiffs made a prima facie showing of likely impairment. We express no opinion with regard to the question whether the trial court correctly concluded that plaintiffs made this showing.