ANGLERS OF THE AUSABLE, INC v
DEPARTMENT OF ENVIRONMENTAL QUALITY

Docket Nos. 279301, 279306, 280265, and 280266. Submitted December 9, 2008, at Grand Rapids. Decided March 31, 2009, at 9:10 a.m.

Anglers of the AuSable, Inc., Mayer Family Investment, L.L.C. (Mayer), and the Nancy A. Forcier Trust (Forcier) brought an action in the Otsego Circuit Court against the Department of Environmental Quality and its director (collectively the DEQ) and Merit Energy Company, alleging, in part, common-law water rights violations and statutory violations of the Natural Resources and Environmental Protection Act (NREPA), including the Michigan Environmental Protection Act (MEPA). The alleged violations concerned a corrective action plan approved by the DEQ, which called for pumping contaminated groundwater that originated from Merit's nonriparian property to a treating station on the property, then through a pipeline constructed, in part, over state land to a wetland owned by the Department of Natural Resources (DNR), from which Kolke Creek originates and flows into Lynn Lake and eventually into the AuSable River. Plaintiffs Mayer and Forcier are riparian owners of land abutting the creek, lake, or river and are members of Anglers of the AuSable, which uses the water resources for recreational purposes. The plaintiffs claimed that the proposed discharge of the treated water will harm the quality of the water and their use of the water. The court, Dennis F. Murphy, J., issued an opinion and order enjoining Merit Energy from discharging any treated water into the Kolke Creek system. The court specifically found that the proposed discharge would constitute an unreasonable use of riparian rights, which the DNR's easement for the pipeline failed to convey to Merit Energy, and a violation of MEPA. The plaintiffs moved for clarification and modification of the order, and the court entered an order indicating that no bar exists for the artificial use of a watercourse for the benefit of a parcel outside a watershed, that the DNR may convey riparian rights by easement to Merit Energy, that the proposed discharge was unreasonable, and that the prior order of the court was the final order in this case. The court then awarded the

plaintiffs fees and costs. Separate appeals were brought by the DEQ, Anglers of the AuSable and Mayer, and Merit Energy, and the appeals were consolidated.

The Court of Appeals *held*:

1. Jurisdiction was proper in the Otsego Circuit Court. The pre-enforcement review provision of part 201 of the NREPA, MCL 324.20137(4), does not apply to this action and did not deprive the circuit court of subject-matter jurisdiction.

2. The circuit court erred by failing to dismiss the DEQ from this action. The DEQ's review of Merit Energy's corrective action plan and the DEQ's issuance of a general permit and certificate of coverage allowing the discharge of treated water into the wetland constituted administrative decisions and were not conduct. Where a defendant's conduct itself does not offend MEPA, no MEPA violation exists. An improper administrative decision, standing alone, does not harm the environment. Therefore, MEPA provides no basis for review of the DEQ's decision.

3. The trial court erred by ruling that the easement from the DNR did not allow Merit Energy to discharge the water into the watershed. The DNR, as a riparian owner, could lawfully convey the easement to Merit Energy. The riparian right to discharge water into a watercourse was granted by easement.

4. The trial court did not err by finding that the proposed discharge would affect the plaintiffs' riparian property rights by affecting their use of Kolke Creek and Lynn Lake.

5. The trial court correctly determined that surface water law was inapplicable in this case because there is no dispute that Kolke Creek is classified as a watercourse at the point that it flows onto the plaintiffs' land. The treated water was no longer surface water by the time it reached the plaintiffs' land.

6. The trial court correctly determined that the reasonable use balancing test applied to the dispute in this case. Because the rights the DNR granted Merit Energy by easement are riparian rights, the dispute should be analyzed under the reasonable use test that is applicable to disputes between riparian proprietors.

7. There are two equally available ways to prove a prima facie case that MEPA has been violated. First, the trial court may make detailed and specific findings that the defendant's conduct has polluted, impaired, or destroyed, or is likely to pollute, impair, or destroy, the air, water, or other natural resources. Second, the trial court may find that the defendant has violated an applicable pollution control standard. Determining whether a statute con-

tains a pollution control standard is relevant when the plaintiff has alleged, as a way to prove a prima facie case, that the defendant's conduct has, or will, violate a statute or regulation. At that point, the trial court must decide if the statute contains a pollution control standard. If it does, the defendant's violation of the statute, by itself, can be used to satisfy the prima facie case standard. If, as in this case, the cited statute does not contain a pollution control standard, then a violation of the statute cannot, by itself, establish a prima facie case.

8. The trial court, although not required to do so, did articulate a pollution control standard in this case.

9. Any error the trial court may have committed regarding the admission of evidence or testimony relating to the evidence was harmless.

10. The Revised Judicature Act does not support an award of costs for transcripts under the facts of this case. The trial court erred in awarding the plaintiffs such costs. The trial court erred in awarding transcript costs under MEPA. Costs allowed under MEPA are the same as those allowed under the Revised Judicature Act.

11. Attorney fees are not awardable under MEPA. The trial court erred by awarding under MEPA "other costs" that constitute nothing more than office overhead and other expenses related to the general practice of law that are generally encompassed by attorney fees.

12. The opinion and order of the trial court must be reversed insofar as it holds that the easement failed to convey riparian rights to Merit Energy and that the DEQ should not be dismissed from this case. The order awarding costs and fees with regard to the DEQ and for transcripts under the Revised Judicature Act and "other costs" under MEPA must be reversed. In all other respects the opinion and order of the trial court must be affirmed.

Affirmed in part and reversed in part.

1. ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — ADMINISTRATIVE LAW — APPEAL.

Where a defendant's conduct itself does not offend the Michigan Environmental Protection Act, no violation of the act exists; an improper administrative decision, standing alone, does not harm the environment and does not provide a basis for judicial review of the decision under the act (MCL 324.1701 *et seq.*).

2. WATER AND WATERCOURSES — RIPARIAN RIGHTS — EASEMENTS — NONRIPARIAN LANDOWNERS.

> Full riparian rights and ownership may not be severed from riparian land and transferred to nonriparian back lot owners; however, the original owner of riparian property may grant an easement to back lot owners allowing them to enjoy certain rights that are traditionally regarded as exclusively riparian; rights granted to a nonriparian owner by easement are not limited to access or ingress and egress, and may include the riparian owners' right to drain their land into an adjoining watercourse.

3. ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — PRIMA FACIE CASE OF ENVIRONMENTAL PROTECTION ACT VIOLATIONS — POLLUTION CONTROL STANDARDS.

> A trial court, in determining whether a plaintiff has made out a prima facie violation of the Michigan Environmental Protection Act, may employ either of the equally available methods of making detailed and specific findings that the defendant's conduct has polluted, impaired, or destroyed, or is likely to pollute, impair, or destroy, the air, water, or other natural resources, or it may find that the defendant has violated an applicable pollution control standard (MCL 324.1701 *et seq.*).

4. ENVIRONMENT — ENVIRONMENTAL PROTECTION ACT — COSTS — ATTORNEY FEES.

> The costs allowed under the Michigan Environmental Protection Act are the same as costs allowed under the Revised Judicature Act; the Michigan Environmental Protection Act does not provide for an award of attorney fees (MCL 324.1701 *et seq.*, 600.101 *et seq.*).

*Olson, Bzdok & Howard, P.C.* (by *James M. Olson, Scott W. Howard,* and *Jeffrey L. Jocks*), and *Thomas A. Baird* for Anglers of the AuSable, Inc.

*Topp Law PLC* (by *Susan Hlywa Topp*) for Mayer Family Investments, L.L.C., and the Nancy A. Forcier Trust.

*Michael A. Cox*, Attorney General, *B. Eric* Restuccia, Solicitor General, and *Tonatzin M. Alfaro Maiz*, Assistant Attorney General, for the Department of Environmental Quality.

*Foster, Swift, Collins & Smith, P.C.* (by *Charles E. Barbieri* and *Zachary W. Behler*), for Merit Energy Company.

Before: MURRAY, P.J., and MARKEY and WILDER, JJ.

MURRAY, P.J. In these consolidated appeals, defendants, the Department of Environmental Quality and the Director of the Department of Environmental Quality (collectively the DEQ), and Merit Energy Company, appeal as of right the trial court's June 25, 2007, opinion and final order granting in part plaintiffs' motion for clarification and modification of the court's prior order of injunction. Plaintiffs Anglers of the AuSable, Inc., and Mayer Family Investments, L.L.C., cross-appeal that same order. We reverse that order to the extent it concludes that the DEQ's easement failed to convey riparian rights to Merit Energy, and we reverse the trial court's decision not to dismiss the DEQ. In all other respects we affirm that order. Additionally, defendants appeal as of right the trial court's order awarding plaintiffs fees and costs. We reverse that order insofar as it pertains to the DEQ and to the extent that it awards costs for (1) James Janiczek's transcript under the Revised Judicature Act (RJA), MCL 600.2401 *et seq.*, and (2) "other costs" under the Michigan Environmental Protection Act (MEPA), MCL 324.1701 *et seq.* In all other respects, we affirm that order.

### I. BACKGROUND

This case arises out of Merit Energy's proposed plan to treat a plume of contaminated groundwater, located in the Manistee watershed, and discharge that treated water into the AuSable River water system.

In 2004, Merit Energy purchased the Hayes 22 Central Production Facility (CPF) located in Hayes Township, Otsego County, Michigan, from Shell Western Exploration and Production, Inc. Pursuant to the transfer agreement with Shell, Merit Energy entered into a settlement agreement with the DEQ to treat the plume, which originated from the CPF. Although spanning an area of 60 acres, the exact size of the plume, which continues to expand, is unknown. Among the contaminants in the plume are benzene, toluene, ethylbenzene, and xylenes (BTEX) and chlorides contained in brine. The plume has already contaminated two residential drinking wells and may contaminate other residential wells as it continues to expand.

After acquiring the CPF, Merit Energy evaluated a number of options to treat the plume, ultimately deeming air stripping—a process forcing a stream of air through water causing hydrocarbons (i.e., the BTEX) to evaporate—the most effective option.[1] Regarding disposal of treated water, Merit Energy determined that discharge into a waterway would be the most prudent alternative and selected Kolke Creek as the best outlet.[2]

---

[1] Merit Energy also considered using infiltration basins (shallow underground basins permitting absorption of treated water into soil) and injection wells (a process by which contaminated groundwater is exchanged with treated water), but rejected these options because complications, including increased plume size, may ensue. In ultimately settling on air stripping, Merit Energy worked closely with the DEQ to find a cost-effective procedure that would satisfy DEQ regulations. The DEQ approved the air stripping, and that decision was at issue in the administrative appeal. See note 6 of this opinion.

[2] Although Merit Energy examined Frenchman's Creek, Lake Tecon, and the Manistee River as alternative discharge outlets, Merit Energy concluded that Kolke Creek was the best option because the others contained access problems and were farther from the plume.

Kolke Creek forms the headwater system for the AuSable River watershed. Groundwater feeds this creek, which originates in a wetland system owned by the Michigan Department of Natural Resources (DNR). From the wetland system, the creek flows past four beaver dams then under a driveway owned by plaintiff Nancy A. Forcier Trust (Forcier) and into Lynn Lake. Both Kolke Creek and Lynn Lake form an oligotrophic system, i.e., an ecosystem with low nutrient content and resultant high degree of clarity.[3] While Mayer is the only riparian owner along Lynn Lake, members of Anglers use this lake for recreational purposes.[4]

In 2004, the DEQ approved Merit Energy's corrective action plan, which called for pumping the contaminated groundwater from the plume to the CPF for iron and air stripper treatment. In addition, the DEQ issued a general permit and certificate of coverage (COC) allowing discharge of treated water from the air stripper system into the wetland area flowing into Kolke Creek.[5] Accordingly, Merit Energy constructed a pipeline from the CPF to the wetland system. The pipeline spans 1.3 miles and traverses nearly one-half mile of state-owned land. Merit Energy obtained an easement from the DNR for the construction over state land. Although the COC permits Merit Energy to discharge 800 gallons of treated water a minute into Kolke Creek, the plan

---

[3] The AuSable River is a designated Blue Ribbon trout stream, and the evidence showed that Kolke Creek provides optimal spawning conditions for native brook trout.

[4] Janney Simpson of plaintiff Mayer Family Investments testified that her family has used this water system since 1916, and that she and her family currently use Lynn Lake for fishing, swimming, rowing, kayaking, and canoeing and that they also fish near the inlet of Kolke Creek.

[5] Specifically, the water was to be discharged into an underground catch basin where it would bubble up into a riprap and "sheet flow" down into the wetland area.

provides for a discharge of only 700 gallons a minute, at which rate it was estimated the plume would be fully treated in 10 years. The pipeline was constructed in late 2005 or 2006. However, the remainder of the corrective action plan has not been implemented.

When a hearing referee dismissed plaintiffs' administrative challenge to the COC in September 2005, plaintiffs filed suit in the Otsego Circuit Court, petitioning for review of that decision and alleging both common-law water rights violations and statutory violations under the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*, including MEPA. The trial court separated plaintiffs' petition regarding the contested case hearing and remanded that matter for review by the DEQ director.[6]

Following a bench trial regarding plaintiffs' other claims, the trial court issued an opinion and order on May 29, 2007, enjoining Merit Energy from discharging any treated water into the Kolke Creek water system. Specifically, after determining that it had proper subject-matter jurisdiction, the court concluded that the proposed discharge would constitute an unreasonable use of riparian rights, which the DNR's easement failed to convey to Merit Energy, as well as a MEPA violation. The court noted, however, that should Merit Energy obtain an easement granting riparian rights, an evidentiary hearing would commence if the parties were unable to agree on reasonable use. Plaintiffs moved for clarification and

---

[6] The director affirmed the hearing referee's decision, which, upon plaintiffs' subsequent appeal, the circuit court reversed. Both this Court, and the Supreme Court on reconsideration, denied defendants' delayed application for leave to appeal the circuit court's decision. *Anglers of the AuSable, Inc v Dep't of Environmental Quality*, 483 Mich 887 (2009); *Anglers of the AuSable, Inc v Dep't of Environmental Quality*, unpublished order of the Court of Appeals, entered September 24, 2008 (Docket No. 284315).

modification of this order, and the court entered an order of clarification and modification on June 25, 2007, indicating that no bar exists for the artificial use of a watercourse for the benefit of a parcel outside a watershed, the DNR may convey riparian rights by easement to Merit Energy, and the proposed discharge was unreasonable. The court also modified the May 29, 2007, order to be the final order in this case.

On August 8, 2007, the court awarded plaintiffs fees and costs for their expert witnesses under MCL 600.2164 of the RJA or, alternatively, under MEPA in the interests of justice. In addition, the court awarded "other costs" requested by plaintiffs exclusively under MEPA.

II. ANALYSIS

A. SUBJECT-MATTER JURISDICTION

Defendants first argue that the pre-enforcement review provision of part 201, MCL 324.20101 *et seq.*, of the NREPA deprived the trial court of subject-matter jurisdiction over plaintiffs' MEPA claim. We disagree. This Court reviews de novo both the question of subject-matter jurisdiction and application of the NREPA, but reviews a trial court's factual findings for clear error. *In re Petition by Wayne Co Treasurer*, 478 Mich 1, 14; 732 NW2d 458 (2007); *Michigan Bear Hunters Ass'n v Natural Resources Comm*, 277 Mich App 512, 526; 746 NW2d 320 (2008); *Preserve the Dunes, Inc v Dep't of Environmental Quality (On Remand)*, 264 Mich App 257, 259; 690 NW2d 487 (2004) (*Preserve the Dunes II*).

The pre-enforcement review provision of part 201 provides, in relevant part: "A state court does not have jurisdiction to review challenges to a response activity

*selected or approved by the department under this part* or to review an administrative order issued under this part in any action . . . ." MCL 324.20137(4) (emphasis supplied).[7] The evidence established that the DEQ's approval of Merit Energy's corrective action plan fell under part 615, not part 201. Part 615 of the NREPA regulates oil and gas well facilities and provides the DEQ with authority over matters relating to unreasonable damage to groundwater resulting from the use of such facilities. See MCL 324.61501(q)(*i*)(B), MCL 324.61503, and MCL 324.61505. Indeed, DEQ employees Ricky Henderson and Judith Woodcock, who reviewed and approved the corrective action plan, testified that the plan was specifically "approved by the department under" part 615.

Defendants, however, contend that the pre-enforcement bar is applicable because the corrective action plan constitutes a "response activity" under part 201. For several reasons, this argument is not persuasive. First, as noted above, the DEQ did not select or approve the corrective action plan under part 201, but instead specifically cited part 615. Second, part 201 defines a "[r]esponse activity" as the

> evaluation, interim response activity, remedial action, demolition, or the taking of other actions necessary to protect the public health, safety, or welfare, or the environment or the natural resources. Response activity also includes health assessments or health effect studies carried out under the supervision, or with the approval of, the department of public health and enforcement actions related to any response activity. [MCL 324.20101(1)(ee).]

---

[7] While MCL 324.20137(4)(a) through (e) contain several exceptions to this bar on pre-enforcement review, the parties raise no issue regarding these exceptions.

Here, even though the corrective action plan referenced part 201 to establish "risk based cleanup goals for the site," it is not clear that such guidance constituted a "response activity" under part 201. For starters, the DEQ expressly approved a "Corrective Action Plan," which is specifically referenced in part 615, and to which part 201 makes no reference. Rather, part 201 provides for a "[r]emedial action plan," which is "a work plan for performing remedial action *under this part.*" MCL 324.20101(1)(dd) (emphasis supplied). Moreover, that administrative rules promulgated under part 615 require well cleanup in accordance with all applicable state laws and regulations pertaining to losses of oil and gas is insufficient to show that part 615 incorporates part 201. See Mich Admin Code, R 324.1006. Indeed, neither part 615 nor rules promulgated pursuant to that part make any reference to part 201. Furthermore, it is part 615 of the NREPA that deals specifically with oil and gas waste—the contamination at issue in this case.[8] Therefore, given that part 201 expressly limits jurisdiction only where a response activity is approved "under this part," MCL 324.20137(4), the bar of part 201 does not apply to this case where the corrective action plan was not a "response activity" and was approved by the DEQ under part 615.

In furtherance of their argument that the pre-enforcement review provision of part 201 applies, defendants rely on *Genesco, Inc v Dep't of Environmental*

---

[8] Part 615 defines "[u]nderground waste," in part, as: "Unreasonable damage to underground fresh . . . waters . . . from operations for the . . . handling of oil or gas," MCL 324.61501(q)(i)(B), and defines "[s]urface waste," in part, as: "The unnecessary or excessive surface loss or destruction without beneficial use, however caused, of gas, oil, or other product, but including the loss or destruction . . . resulting from . . . seepage [or] leakage . . . especially a loss or destruction . . . from inefficient storage or handling of oil," MCL 324.61504(q)(ii)(A).

*Quality*, 250 Mich App 45, 53; 645 NW2d 319 (2002), contending that because parts 201 and 615 both have the same general purpose of protecting the environment, they must be construed *in pari materia*. *Genesco*, however, is not instructive on this issue.

In *Genesco*, the DEQ approved a remedial action plan under part 201. The plaintiff, which operated a leather tannery adjacent to a contaminated lake, claimed that because the DEQ's remediation plan under part 201 violated part 17 (i.e., MEPA), the pre-enforcement review provision of part 201 was inapplicable. *Id.* at 47-49. This Court affirmed the trial court's conclusion that part 201 deprived the court of subject-matter jurisdiction and held that "claims under part 17 may not be brought where the underlying controversy is over a 'response activity' as defined in part 201." *Id.* at 53. In arriving at this conclusion the Court explained that "parts 17 and 201 must be read in pari materia because they both have the same general purpose of protecting the environment . . . and must be read in the context of the entire [NREPA] so as to produce an harmonious whole" lest pre-enforcement litigation frustrate the DEQ's attempt to clean contaminated sites. *Id.*

Here, we have already concluded that plaintiffs' challenge was in no way predicated on part 201. Thus, in contrast to *Genesco*, the parts of the NREPA to be construed *in pari materia* are parts 17 (MEPA) and 615. Unlike part 201, however, part 615 contains no bar to subject-matter jurisdiction. Thus, application of *Genesco* does not deprive the circuit court of subject-matter jurisdiction.

While we are cognizant of defendants' argument that this conclusion may allow pre-enforcement litigation that could potentially delay future cleanup efforts of contaminated sites approved under part 615, the plain

language of part 201 unambiguously limits subject-matter jurisdiction to plans approved "under this part." MCL 324.20137(4). Thus, even were we to construe parts 201 and 615 *in pari materia*, we would conclude that the pre-enforcement bar is inapplicable here. Indeed, where "the statute's language is clear and unambiguous, we assume that the Legislature intended its plain meaning, and we enforce the statute as written." *South Haven v Van Buren Co Bd of Comm'rs*, 478 Mich 518, 528; 734 NW2d 533 (2007) (quotation marks and citation omitted). In light of this, the proper forum for resolution of defendants' concern is the Legislature, rather than this Court. Therefore, there was no bar to the circuit court's subject-matter jurisdiction in this case.[9]

We also disagree with defendants' argument that because part 615 confers exclusive jurisdiction on the Ingham Circuit Court to hear this case, plaintiffs brought suit in the wrong forum. See MCL 324.61517(2). As a point of fact, plaintiffs did not bring suit under part 615. Rather, plaintiffs responded that the pre-enforcement provision of part 201 was inapplicable because the DEQ approved Merit Energy's plan under part 615. In other words, plaintiffs' reliance on part 615 does not underlie and was

---

[9] Defendants point out that because the DEQ used the spill clean-up criteria and definition of petroleum in part 201 in its administration of part 615, the corrective action plan constituted a "response activity" under part 201. However, that the DEQ did not require Merit Energy to conduct any interim response activities or feasibility studies as required by regulations promulgated pursuant to part 201 undercuts this point. See MCL 324.20114(1)(h) and Mich Admin Code, R 299.5526(1)(h) and (n). Additionally, defendants contend that the transfer settlement agreement demonstrates that the proposed remediation plan constituted a "response activity." However, a fair reading of the transfer settlement agreement in context does not support this conclusion. Indeed, the transfer settlement agreement expressly provides: "Both parties agree under part 615, the Agreement set forth herein is necessary to prevent waste, to alleviate pollution, impairment, and the destruction of the State of Michigan's natural resources."

not used as a basis for a cause of action in this case, but rather is asserted in a defensive posture to defendants' argument that part 201 bars subject-matter jurisdiction. Jurisdiction was proper in the Otsego Circuit Court. MCL 324.1701(1).

### B. THE DEQ'S ADMINISTRATIVE ACTION

We do, however, agree with the DEQ's contention that because its review of Merit Energy's corrective action plan and issuance of the COC constituted an administrative decision, it did not violate MEPA. "[W]e review de novo the proper application of MEPA. But we will not overturn a trial court's findings of fact unless they are clearly erroneous." *Preserve the Dunes II, supra* at 259 (citations omitted).

"MEPA provides a cause of action for declaratory and other equitable relief for conduct that is likely to result in the pollution, impairment, or destruction of Michigan's natural resources" and provides for immediate judicial review of allegedly harmful conduct. *Preserve the Dunes, Inc v Dep't of Environmental Quality*, 471 Mich 508, 512; 684 NW2d 847 (2004) (*Preserve the Dunes I*); MCL 324.1701(2) and MCL 324.1703(1). Regarding intervention in permit proceedings, MEPA "requires a potential intervenor to file a pleading asserting that the proceeding or action for judicial review involves *conduct* that has violated, or is likely to violate, MEPA." *Preserve the Dunes I, supra* at 521 (emphasis supplied); MCL 324.1705(1). However, "[w]here a defendant's conduct itself does not offend MEPA, no MEPA violation exists." *Preserve the Dunes I, supra* at 519. Because plaintiffs challenged the DEQ's approval of the corrective action plan, their challenge pertained to an administrative decision rather than conduct. However, "[a]n improper administrative decision, standing alone, does not harm the environment." *Id.*

Indeed, it is the actual discharge of treated water into Kolke Creek and Lynn Lake that plaintiffs assert would harm the environment. Thus, MEPA provides no basis for judicial review of this agency decision. "To hold otherwise would broaden by judicial fiat the scope of MEPA and create a cause of action that has no basis in MEPA's language or structure." *Id*. at 524. Consequently, the court erred by failing to dismiss the DEQ from this action.[10]

### C. THE EASEMENT

Defendants next argue that the trial court erred by finding that the easement failed to adequately specify the right to discharge treated water. "The extent of a party's rights under an easement is a question of fact, and a trial court's determination of those facts is reviewed for clear error." *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005). We hold that the trial court erred by ruling that the easement did not allow Merit Energy to discharge the water into the watershed.

"[T]he use of an easement must be confined strictly to the purposes for which it was granted or reserved." *Id*. at 41 (quotation marks and citation omitted). Not surprisingly, these purposes are determined by the text of the easement. *Little v Kin*, 468 Mich 699, 700; 664 NW2d 749 (2003) (*Little II*). "Where the language of a legal instrument is plain and unambiguous, it is to be enforced as written and no further inquiry is permitted. If the text of the easement is ambiguous, extrinsic

---

[10] Plaintiffs contend that the DEQ was a proper party because the COC gave Merit Energy riparian or property rights to discharge treated water into Kolke Creek that would harm the environment. However, the COC merely authorizes the discharge of water and makes no reference to a grant of property rights.

evidence may be considered by the trial court in order to determine the scope of the easement." *Id.* (citation omitted).[11]

The easement in this case expressly provided Merit Energy the "right to place, construct, operate, repair, and maintain" the pipeline over the state-owned land at issue. The term "operate" clearly and unambiguously refers to the operation of the pipeline that will discharge treated water into Kolke Creek. Further supporting this plain meaning is the easement's own requirement that Merit Energy notify the DNR of the *release* of any toxic or hazardous substance resulting from *operation* of the pipeline. Additionally, attached to the easement is a condition requiring Merit Energy to submit "operating instructions" requiring visual inspection of the water line and discharge point on a regular basis. Thus, the term "operate" clearly encompasses the discharge of treated water. Further, plaintiffs are incorrect that the easement only permitted operation of the pipeline to the riprap area above the wetland. On the contrary, the reference diagram attached to the easement clearly indicates discharge flowing into Kolke Creek. Therefore, the trial court erred by concluding that the easement failed to grant Merit Energy the right to discharge treated water into Kolke Creek.

We also reject plaintiffs' contention on cross-appeal that because Merit Energy's land is nonriparian, the

---

[11] Although both defendants and the trial court cited this Court's opinion in *Little v Kin*, 249 Mich App 502, 511; 644 NW2d 375 (2002) (*Little I*), aff'd 468 Mich 699 (2003), in support of the proposition that "the intent of the plattors should be determined with reference to the language used in connection with the facts and circumstances existing at the time of the grant" to determine the scope of an easement, our Supreme Court expressly rejected this approach, finding it "clearly inconsistent with the well-established principles of legal interpretation ... [and] thus incorrect." *Little II, supra* at 700 n 2.

trial court erred by ruling that Merit Energy could lawfully obtain an easement. This Court reviews the scope and application of common-law claims, such as the application of riparian law, de novo, but reviews a trial court's factual findings in a bench trial for clear error. *Michigan Citizens for Water Conservation v Nestlé Waters North America Inc*, 269 Mich App 25, 53; 709 NW2d 174 (2005), aff'd in part, rev'd in part, and remanded on other grounds 479 Mich 280 (2007); *Walters v Snyder*, 239 Mich App 453, 456; 608 NW2d 97 (2000).

"[W]hile full riparian rights and ownership may not be severed from riparian land and transferred to non-riparian backlot owners, Michigan law clearly allows the original owner of riparian property to grant an easement to backlot owners to enjoy certain rights that are traditionally regarded as exclusively riparian." *Little v Kin*, 249 Mich App 502, 504-505; 644 NW2d 375 (2002) (*Little I*), aff'd 468 Mich 699 (2003). Traditionally, riparian owners[12] are permitted to drain their land into an adjoining watercourse, *Saginaw Co v McKillop*, 203 Mich 46, 52; 168 NW 922 (1918), and rights granted to nonriparians by easement are not limited to access or ingress and egress, *Dyball v Lennox*, 260 Mich App 698, 706; 680 NW2d 522 (2004), citing *Little I, supra* at 514-516. Thus, the DNR, as a riparian owner, could lawfully convey the easement at issue to Merit Energy.

While plaintiffs maintain that the grant was apart from the land because it pertained to water originating on nonriparian land, this argument confuses the right at issue, i.e., the DNR's right to discharge water into a watercourse. This right is inherently riparian and

---

[12] "Land which includes or is bounded by a natural watercourse is defined as riparian." *Thies v Howland*, 424 Mich 282, 287-288; 380 NW2d 463 (1985).

therefore connected to, rather than apart from, the land. *McKillop, supra* at 52. It is this riparian right that was granted by easement. Therefore, plaintiffs' argument does not hold water.[13]

### D. COMMON-LAW CLAIMS

As an initial matter, defendants claim that the court erred by finding that the proposed discharge would affect plaintiffs' property rights by affecting their use of Kolke Creek and Lynn Lake.[14] We disagree. This Court reviews the scope and application of common-law claims de novo, but reviews a trial court's factual findings in a bench trial for clear error. *Nestlé, supra* at 53; *Walters, supra* at 456.

"Riparian rights are derived from and are dependent on ownership of 'land' which abuts a natural body of water; thus, they constitute part of the property possessed by riparian landowners and become their property rights." *Hess v West Bloomfield Twp*, 439 Mich 550, 562; 486 NW2d 628 (1992). " '[A]ll the riparian proprietors have an equal or common right to use the water, but each must exercise his rights in a reasonable manner and to a reasonable extent, so as not to interfere unnecessarily with the corresponding rights of others.' " *Square Lake Hills Condo Ass'n v Bloomfield Twp*, 437 Mich 310, 337 n 9; 471 NW2d 321 (1991)

---

[13] Although plaintiffs call attention to *Alburger v Philadelphia Electric Co*, 112 Pa Commw 441, 445; 535 A2d 729 (1988), that case pertained to a riparian owner's right to discharge into a stream water not originating from riparian land. In contrast, the water in this case would be discharged into an area feeding a watercourse that originated *exclusively* on riparian land.

[14] We note that, contrary to defendants' assertion, Mayer and Forcier, as members of Anglers, had standing as individual plaintiffs. *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 629; 684 NW2d 800 (2004).

(LEVIN, J., dissenting), quoting 23 Michigan Law & Practice, Waters and Watercourses, § 2, p 262.

Merit Energy proposes to use this water system to discharge treated water. The trial court found that the following would result as a consequence of Merit Energy's use: increased sedimentation, phosphorus levels, and erosion into Lynn Lake; significant flooding along Kolke Creek; aesthetic and economic impairment of Kolke Creek; overall drop in water quality and increase in turbidity;[15] and harm to aquatic life. The record supports these findings. In light of the effects of the proposed discharge, Merit Energy's use of the water system would necessarily interfere with plaintiffs' use, thereby affecting their riparian rights. Indeed, our Supreme Court has long held that any use that "materially . . . adulterates the water" may impair riparian rights "for the ordinary purposes of life." *People v Hulbert*, 131 Mich 156, 168-169; 91 NW 211 (1902) (quotation marks and citations omitted). Moreover, although defendants assert that diminution in water quality alone is not actionable, plaintiffs' alleged injury in fact was sufficient to support a cause of action where they "aver[red] that they use[d] the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Nat'l Wildlife Federation v Cleveland Cliffs Iron Co*, 471 Mich 608, 629; 684 NW2d 800 (2004) (quotation marks and citations omitted).

Defendants also contend that plaintiffs cannot claim a property right in lands that have been traditionally flooded as a result of the Lake Tecon impoundment above the discharge site. However, the only authority defendants cite in support of this proposition does not

---

[15] Turbidity is a measurement of cloudiness in the water caused by suspended particles.

address this specific point. See *Burt v Munger*, 314 Mich 659; 23 NW2d 117 (1946); *Hyatt v Albro*, 121 Mich 638; 80 NW 641 (1899). In any event, the proposed discharge would have a qualitatively different effect on Kolke Creek than any traditional flooding. Indeed, plaintiffs' expert, Dr. Christopher Grobbel, testified that previous flooding was a natural event of short-term duration, whereas the proposed discharge would inundate the area for a period of many years. Thus, defendants' argument fails.

On cross-appeal, plaintiffs argue that the trial court should have applied surface water law because the proposed discharge does not originate on the DNR's land. We disagree. The characterization of water as a watercourse or surface water governs a party's right to discharge water into a water system. *Kernen v Homestead Dev Co*, 232 Mich App 503, 511-512; 591 NW2d 369 (1998).[16] Here, the corrective action plan calls for the treated water to be discharged into the wetland system that flows into Kolke Creek. The wetland system and Kolke Creek originate solely on DNR property. It is undisputed that Kolke Creek is classified as a watercourse before flowing onto plaintiffs' land. Thus, regardless of whether the treated water is surface water at the discharge point, it is no longer surface water by the time it reaches plaintiff's land because surface waters "are lost by . . . reaching some definite water-

---

[16] The characterization of water as a watercourse entitles a riparian owner to reasonable use of that watercourse, but does not permit the riparian owner to pollute the water or to unreasonably increase the flow to the extent that it floods another riparian owner's property. *Kernen supra* at 511-512. In contrast, the characterization of water as surface water renders an increase in flow by the owner of an upper estate a trespass because "the owner of a lower or servient estate must receive the surface water from the upper or dominant estate in its natural flow." *Id.* at 512 (quotation marks and citation omitted).

course or substantial body of water into which they flow." *Id.* at 511 n 7. Therefore, the trial court correctly deemed surface water law inapplicable.

Plaintiffs argue, alternatively, that the trial court erroneously applied the reasonable use balancing test. However, this Court has determined that "under Michigan's riparian authorities, water disputes between riparian proprietors are resolved by a reasonable use test that balances competing water uses to determine whether one riparian proprietor's water use, which interferes with another's use, is unreasonable under the circumstances." *Nestlé, supra* at 58. "Under the reasonable use doctrine, a riparian owner may make any and all reasonable uses of the water, as long [as he does] not unreasonably interfere with the other riparian owners' opportunity for reasonable use." *Id.* at 55 (quotation marks and citation omitted). Here, although Merit Energy is not a riparian proprietor, its proposed discharge specifically utilizes the rights granted by the DNR's easement. Since the rights the DNR granted by easement are riparian, this dispute should be analyzed under the law applicable to disputes between riparian proprietors.

It is plaintiffs' contention that the reasonable use balancing test enunciated in *Nestlé* is inapplicable because *Nestlé* was a groundwater case. Although plaintiffs are correct that *Nestlé* applied the reasonable use balancing test to a groundwater claim, the test is not limited to groundwater cases. On the contrary, after reviewing the origin and development of water law in Michigan since the 19th century, *id.*, citing *Dumont v Kellogg*, 29 Mich 420, 422 (1874), *Nestlé* specifically concluded, *before addressing any groundwater claim,*

that "water disputes between riparian proprietors are resolved by a reasonable use test," *Nestlé, supra* at 58.

Plaintiffs note that *Nestlé* is distinguishable because the groundwater at issue in *Nestlé* had a hydraulic connection to the watercourse whereas Merit Energy's proposal to discharge treated water constitutes a use of riparian rights to benefit nonriparian (i.e., Merit Energy's) land. This contingency does not distinguish *Nestlé*, but instead is a factor in *Nestlé*'s reasonable use balancing test. *Id.* at 72. Moreover, *Nestlé* relied on the Restatement of Torts, 2d, in applying the reasonable use balancing test to the groundwater dispute, *id.* at 71 n 46, citing 4 Restatement Torts, 2d, § 850A, p 220, and the factors set forth in that Restatement section pertain to the reasonable use of water generally—i.e., without specific limitation to groundwater disputes. Further, although *Nestlé* expressly adopted and applied the reasonable use balancing test to a dispute between groundwater and riparian users, *Nestlé* identified this test as the one "first stated in *Dumont*[.]" *Nestlé, supra* at 68. The *Dumont* test was not limited to groundwater cases. *Dumont, supra* at 423-425. In light of this, it cannot be said that *Nestlé* ignored the doctrine of stare decisis or that its explanation of the reasonable use balancing test constituted mere dictum. Consequently, we conclude that because it was only the *Nestlé* Court's application of the reasonable use balancing test that pertained to a groundwater dispute, its explanation and analysis of the reasonable use balancing test is instructive here.[17] Therefore, the trial court correctly concluded that the reasonable use balancing test applies.

---

[17] Plaintiffs' assertion that an "unreasonable use per se test" was applicable also fails in light of the *Nestlé* Court's treatment of that issue: "[I]n the context of riparian rights, prior courts have determined that uses that did not benefit the riparian land were unreasonable per se . . . we believe that such a per se rule is incompatible with modern use of the

Finally, we note Merit Energy's contention that the trial court failed to determine the volume of water to be discharged under the reasonable use balancing test. However, that finding would have been premature given the trial court's finding—albeit an erroneous one—that the easement did not convey the right to discharge. In any event, the arguments and evidence presented at trial focused on whether the *proposed* discharge was reasonable or whether reasonable alternatives existed, and the trial court determined the reasonableness of the proposed discharge. In addition, the trial court's final order did not effectively overrule the interim order's enjoining of the proposed discharge or conclusion that further evidence could be submitted concerning a lower discharge amount, as the only limiting language in the final order refers to the court's finding that the proposed discharge was unreasonable.

### E. MEPA

Defendants' principal argument under MEPA is that the trial court erred by finding a prima facie violation of MEPA because it failed to apply part 31 (the water resources protection act) of the NREPA, MCL 324.3101 *et seq.*, as a pollution control standard. We disagree. "[W]e review de novo the proper application of MEPA. But we will not overturn a trial court's findings of fact unless they are clearly erroneous." *Preserve the Dunes II, supra* at 259 (citations omitted).

To establish a prima facie violation of MEPA, a plaintiff must show that "the defendant has or is likely to pollute, impair, or destroy the air, water, or other natural resources." *Nestlé, supra* at 88, citing MCL

---

balancing test. Instead, we hold that the location of the use is but one of the factors that should be considered in balancing the relative interests." *Nestlé, supra* at 72 n 49.

324.1703(1) and *Ray v Mason Co Drain Comm'r*, 393 Mich 294, 309; 224 NW2d 883 (1975). "[I]n determining that a plaintiff has made out a prima facie MEPA violation, the trial court may either (1) make detailed and specific findings that the defendant's conduct has polluted, impaired, or destroyed, or is likely to pollute, impair, or destroy, the air, water, or other natural resources, *or* (2) find that the defendant has violated an applicable pollution control standard." *Nestlé, supra* at 89 (citations omitted; emphasis supplied). Once a prima facie case is established, the burden shifts to the defendant, who may rebut the prima facie case with evidence to the contrary. *Id.*

As a preliminary matter, defendants argue that the standards for determining a prima facie MEPA violation enunciated in *Nestlé* do not present "equally available methods" of inquiry. Rather, defendants contend that a court may make detailed and specific factual findings regarding a defendant's conduct *only if* no applicable pollution control standard exists or if an existing pollution control standard is deficient. Although a creative argument, we cannot square it with the statute and caselaw.

MEPA does not contain specific standards or requirements concerning adverse environmental impact. *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16, 30; 576 NW2d 641 (1998). It does, however, set forth how a case is to proceed in the circuit court, starting off with the plaintiff's having to prove a prima facie case that the defendant's conduct has polluted or will likely pollute natural resources:

> When the plaintiff in the action has made a prima facie showing that the conduct of the defendant has polluted, impaired, or destroyed or is likely to pollute, impair, or destroy the air, water, or other natural resources or the

public trust in these resources, the defendant may rebut the prima facie showing by the submission of evidence to the contrary. The defendant may also show, by way of an affirmative defense, that there is no feasible and prudent alternative to defendant's conduct and that his or her conduct is consistent with the promotion of the public health, safety, and welfare in light of the state's paramount concern for the protection of its natural resources from pollution, impairment, or destruction. Except as to the affirmative defense, the principles of burden of proof and weight of the evidence generally applicable in civil actions in the circuit courts apply to actions brought under this part. [MCL 324.1703(1).]

Courts are to consider this statute for guidance in crafting findings of fact, *City of Jackson v Thompson-McCully Co, LLC*, 239 Mich App 482, 488; 608 NW2d 531 (2000), and the statute's focus is entirely on the defendant's conduct relative to polluting, impairing, or destroying natural resources. Consequently, and contrary to defendants' argument, our courts have held that there are two ways to prove a prima facie MEPA case, *one of which* is proving that the defendant's conduct violated a pollution control standard. See *Nestlé, supra* at 89; *Preserve the Dunes I, supra* at 517 n 5 (noting that the defendant's opportunity to rebut a prima facie case remains the same "whether that violation has been established *independently or by reference to another statute's pollution control standard*" [emphasis supplied]).

Defendant places great emphasis on MCL 324.1701(2), which provides:

In *granting relief* provided by subsection (1), if there is a standard for pollution or for an antipollution device or procedure, fixed by rule or otherwise, by the state or an instrumentality, agency, or political subdivision of the state, the court may:

(a) Determine the validity, applicability, and reasonableness of the standard.

(b) If a court finds a standard to be deficient, direct the adoption of a standard approved and specified by the court. [Emphasis supplied.]

The plain language of this section applies at the point when a circuit court is "granting relief" as authorized by subsection 1,[18] and thus applies *after* a violation of MEPA has been found. Black's Law Dictionary (7th ed); *ADVO-Systems, Inc v Dep't of Treasury*, 186 Mich App 419, 424; 465 NW2d 349 (1990) (dictionaries are useful tools for determining the common understanding of undefined statutory terms). Through this section, the Legislature has provided courts with the explicit authority to fashion relief consistent with existing pollution control standards, or to adopt new standards if the existing ones are found invalid, inapplicable, or unreasonable.[19] But the Legislature has created no requirement that a prima facie case must include a trial court analysis and finding about any applicable pollution control standard. Indeed, as already discussed, MCL 324.1703(1) contains no such requirement, and its general provisions on standards of proof indicate otherwise. See *Nemeth, supra* at 30 (observing that MEPA creates an environmental common law that "does not impose specific requirements or standards; instead, it provides for de novo review in Michigan courts, allowing those courts to determine any adverse environmental effect and to take appropriate measures"). Thus, the

---

[18] Subsection 1, MCL 324.1701(1), allows a circuit court to grant declaratory and equitable relief if the plaintiff proves that the defendant has violated MEPA.

[19] Without such a legislative grant of authority, a court disregarding applicable statutory requirements would be acting outside the realm of valid judicial authority. *Miller v Riverwood Recreation Ctr, Inc*, 215 Mich App 561, 563; 546 NW2d 684 (1996).

only determinative statutory requirement in evaluating a prima facie MEPA violation "is whether the defendant's conduct will, in fact, pollute, impair, or destroy a natural resource." *Preserve the Dunes I, supra* at 517 n 5.

And that is where defendants misconstrue the varying statements about pollution control standards in *Nemeth* and its progeny. Determining whether a statute contains a pollution control standard is relevant when the plaintiff has alleged, as a way to prove a prima facie case, that the defendant's conduct has, or will, violate a statute or regulation. At that point the court must decide if the statute contains a pollution control standard, for if it does, the defendant's violation of the statute, by itself, can be used to satisfy the prima facie case standard. *Nemeth, supra* at 36; *Nestlé, supra* at 89. If the statute does not contain a pollution control standard, as the trial court concluded in this case, then a violation of the statute cannot alone establish a prima facie case. *Id.* at 94. Hence, *Nemeth* does not *require* a trial court to determine whether statutes cited by defendants contain pollution control standards, as *Nemeth* and the other decisions addressed the need to decide if the statutes allegedly violated contained pollution control standards in order to avoid using the violations as lone support for prima facie cases.

Here, plaintiffs attempted to prove a prima facie case with factual proof that defendants' discharge of treated water into Kolke Creek will likely pollute, impair or destroy natural resources in violation of parts 31, 301, and 303 of MEPA. As required by caselaw, see *Nemeth, supra* at 35, the trial court determined that parts 301 and 303 did not contain pollution control standards, but nonetheless properly utilized them, in part, in deciding whether defendants violated MEPA. See *Nestlé, supra*

at 92 n 69. The trial court made detailed findings of fact in determining that defendants' rate of discharging treated water would likely pollute or impair the natural resource at issue, and that defendants therefore violated MEPA. That process is all that is required by statute, MCL 324.1703(1), and caselaw. *Nemeth, supra* at 36-37; *Ray, supra* at 309-310; *Nestlé, supra* at 88-89.[20]

Defendants argue, in the alternative, that the trial court substantively erred by relying on the *Portage* factors and using parts 301 and 303 as pollution control standards in finding a prima facie MEPA violation. This is incorrect. For starters, while the *Portage* factors are case specific, *Nemeth, supra* at 35, the trial court did not exclusively rely on them in its analysis. On the contrary, the court also examined parts 301 and 303, which the court acknowledged did not contain pollution control standards, as well as relied on its own findings under the common-law reasonable use factors in finding a prima facie violation. This is an appropriate use of both the *Portage* factors and parts 301 and 303. *Nestlé, supra* at 92 n 69, 97. Indeed, the court ultimately concluded that a review of all the factors "weigh[s] in favor of plaintiffs" and that it was "[f]or this reason . . . that plaintiffs have established a prima facie MEPA violation." Therefore, defendants' contention fails.

Finally, we disagree with defendants' assertion that the trial court failed to articulate a pollution control standard. "[T]he MEPA specifically authorizes a court to determine the validity, reasonableness, and applica-

---

[20] That the trial court did not explicitly discuss why part 31 of the NREPA and part 4 of the regulations did not contain pollution control standards is insignificant because the caselaw requires only that the court utilize an "appropriate standard" when deciding the case and fashioning relief, and that standard can be, as in this case, the detailed findings and conclusions made by the court. *Nemeth, supra* at 35; *Ray, supra* at 309.

bility of any standard for pollution or pollution control and to specify a new or different pollution control standard if the agency's standard falls short of the substantive requirements of MEPA." *Nemeth, supra* at 30 (quotation marks, citation, and emphasis omitted). Here, the court made detailed and specific findings that the proposed discharge would: significantly affect wildlife; cause increased flooding, sedimentation, phosphorus levels, chloride levels, and erosion; and severely affect the water quality of the system. Although the court failed to use the words "pollution control standard" in making its findings, we do not find this flaw fatal. First of all, since the court found no pollution control standard, it did not need to create a new one. Second, even statutes that articulate pollution control standards need not contain the words "pollution control standard" to be considered as containing pollution control standards. Rather, determinative of whether statutes contain pollution control standards is whether "the purposes are to protect natural resources or to prevent pollution and environmental degradation . . . ." *Nestlé, supra* at 92 In this case, it is clear that the purpose of the trial court's findings and conclusion that Merit Energy's specific discharge proposal violated MEPA was to protect natural resources and prevent environmental degradation. In other words, the court sufficiently articulated a pollution control standard by holding that the discharge of 700 gallons a minute of treated water into Kolke Creek would likely pollute and impair that watershed system.

Before moving on, however, we again note that the trial court's interim order allows Merit Energy to return to court with a different proposal, presumably one providing for a discharge of less than the 700 gallons a minute that the court found violated MEPA. The trial court will then have another opportunity to

either make detailed findings of fact, or perhaps explicitly create a new standard that sets a limit, if any, regarding the amount of treated water that can lawfully be discharged into Kolke Creek.[21]

### F. EVIDENTIARY CLAIMS

This brings us to defendants' assertion that the trial court committed numerous evidentiary errors. Specifically, defendants argue that the trial court erred by finding that the proposed discharge would likely pollute, impair, or destroy natural resources because its decision was based on the following inadmissible evidence: (1) article abstracts admitted as exhibit 83 and the testimony of plaintiff's expert, Dr. Mark Luttenton based on this exhibit and (2) graphs admitted as exhibits 67 and 135 and the stage discharge analysis of plaintiff's expert, David Hyndman, based on these exhibits. Also, defendants assert that the court improperly excluded defense exhibits and defense expert testimony.

This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *Craig v Oakwood Hosp*, 471 Mich 67, 76; 684 NW2d 296 (2004). "However, when the trial court's decision to admit evidence involves a preliminary question of law, the issue is reviewed de novo, and admitting evidence that is inadmissible as a matter of law constitutes an abuse of discretion." *Barnett v Hidalgo*, 478 Mich 151, 159; 732 NW2d 472 (2007). A trial court abuses its discretion when its decision is outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). We hold that the trial court did not abuse its discretion in its evidentiary rulings or, if it did so, it was harmless error.

---

[21] Neither party has cited a statute or regulation that places any limit on the amount of discharge, if any, that is permitted in this situation.

i. EXHIBIT 83 AND EXPERT ANALYSIS

Exhibit 83 consisted of article abstracts pertaining to the effects of chlorides on water systems. Defendants maintain that this evidence was inadmissible hearsay. Defendants are correct, as the article abstracts are out-of-court statements offered for their truth and do not fall within an established hearsay exception. MRE 801(c); *Merrow v Bofferding*, 458 Mich 617, 626; 581 NW2d 696 (1998). However, we conclude that any error was harmless as there is no indication that the court relied on these abstracts in making its decision.[22]

Further, the inadmissibility of exhibit 83 did not preclude Luttenton's testimony concerning the effects of chlorides on aquatic invertebrates. Under MRE 703, the "facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence." Therefore, a party must show that the "facts or data" upon which an expert relies is admissible before an expert may render an opinion. *People v Yost*, 278 Mich App 341, 362-363; 749 NW2d 753 (2008). This presumes, however, that the "facts or data" refer to the facts of the case that would support the expert's opinion and do not include information or documentation pertaining to the expert's education concerning the topic.

Arguably, the abstracts upon which Luttenton relied pertained to his education on the introduction of chlorides into water systems and their effect on aquatic invertebrates. In contrast, the facts that support Luttenton's opinion are the data concerning the actual chlorides the proposed discharge would add to Kolke

---

[22] While plaintiffs argue that the abstracts were admissible under MRE 707, that rule pertains to the admissibility of statements in reliable treatises for impeachment purposes on cross-examination and is therefore not applicable here.

Creek and Lynn Lake. Exhibit 83 did not contain that data, which defendants do not challenge. Thus, Luttenton's opinion on this matter was properly admitted. In any event, if the evidence was improperly admitted, any error would be harmless as the court's consideration of the effects on aquatic invertebrates was but one of many negative effects supporting the injunction.

### ii. EXHIBITS 67 AND 135 AND EXPERT ANALYSIS

Hyndman testified that the proposed discharge would increase the water level and flow in Lynn Lake and Kolke Creek. This stage discharge analysis was based on water flow measurements made by Hyndman, Grobbel, and Robert Workman. The court admitted these measurements as exhibits 67 and 135.

Defendants challenge the admission of these exhibits on the ground that they were based on unreliable data. "[T]he trial court's role as gatekeeper does not require it to search for absolute truth, to admit only uncontested evidence, or to resolve genuine scientific disputes." *Chapin v A & L Parts, Inc*, 274 Mich App 122, 127; 732 NW2d 578 (2007) (DAVIS, J.). Rather, the focus of the inquiry is whether the expert based his conclusions on a sound foundation. *Id.* at 139.

With respect to this inquiry, MRE 702 provides:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Regarding exhibit 67, defendants assert that the data were unreliable because, with the exception of one flow measurement, Hyndman relied on Grobbel's measurements even though Hyndman claimed his measurement procedure was more reliable than Grobbel's and because Hyndman's and Grobbel's measurements were taken inside culverts. We agree with the trial court and hold that the trial court correctly ruled that defendants' stated objections to the procedures employed by Hyndman go more to the weight of his testimony than to the reliability, and thus admissibility, of his testimony. *Surman v Surman*, 277 Mich App 287, 309-310; 745 NW2d 802 (2007).

We also reject defendants' arguments for two additional reasons. First, while Hyndman claimed that Grobbel used a different measurement procedure, he did not assert that his was more reliable, and defendants fail to explain how the use of different procedures affected the reliability of the measurements. *Mudge v Macomb Co*, 458 Mich 87, 105; 580 NW2d 845 (1998). Second, both Hyndman and Grobbel asserted that the ideal locations for measurements in this system were on the upstream side of culverts. Thus, the stage discharge analysis was not based on unreliable data.[23]

Concerning exhibit 135, defendants point out that Hyndman simply fashioned this exhibit by adding and removing data points from exhibit 67. However, Hyndman explained that he only removed one data point, which was an "outlier," i.e., a data point that was not representative of the relationship depicted in the exhibit. Additionally, disagreement between Grobbel and

---

[23] Defendants also challenge Hyndman's failure to apply a standard deviation analysis. However, Hyndman explained that this approach was not proper in evaluating the measurements at issue. Thus, the trial court had discretion to accept or reject Hyndman's evaluation.

Susan Baker, a defense expert, is relevant to the credibility and weight of each witness's testimony, the determination of which is within the province of the trial court. *Ellsworth v Hotel Corp of America*, 236 Mich App 185, 194; 600 NW2d 129 (1999). Apparently, the court gave more weight to Hyndman's stage discharge analysis, and that was not an abuse of discretion. And any error was harmless since Hyndman's conclusion and the court's ruling were not solely based on the stage discharge analysis, but focused on additional factors that included the effect of the proposed discharge on wildlife and water quality. *People v Rodriquez (On Remand)*, 216 Mich App 329, 332; 549 NW2d 359 (1996) ("The erroneous admission of evidence is harmless if it did not prejudice the defendant.").[24]

### iii. EXCLUSION OF DEFENSE EXHIBITS AND EXPERT TESTIMONY

Defendants' last evidentiary argument is that the trial court erroneously excluded portions of Baker's testimony and exhibits supporting that testimony, as well as portions of Workman's surrebuttal testimony.

With respect to Baker, the court excluded a portion of exhibit XX, a North Carolina storm manual, exhibit EE, which consisted of Baker's drawings illustrating the evolutionary stages of the Kolke Creek system, and Baker's related testimony. These exclusions were not improper. First, the only portion of exhibit XX excluded was the portion that Baker admitted she did not use in her analysis. Thus, that evidence was not relevant and

---

[24] Defendants also contend there was inadequate time to prepare for the introduction of these exhibits since they were not disclosed until the day before trial. However, given that defendants did not begin their case-in-chief until two weeks after exhibit 67 was entered and given that exhibit 135 was entered as rebuttal testimony and applied the same discharge analysis as exhibit 67, we conclude that there was no prejudice.

was therefore inadmissible. MRE 402; *Woodard v Custer*, 476 Mich 545, 569; 719 NW2d 842 (2006). Second, concerning exhibit EE, even if a proper foundation were laid, Baker's analysis of this exhibit concerning whether the system was no longer in an eroding state was not dispositive with regard to Baker's ultimate conclusion that the proposed discharge would not cause erosion. Indeed, Baker considered the effects of vegetation, beaver dams, shear stress, tractive force, and permissible velocity in reaching this conclusion. Thus, any error in excluding exhibit EE and testimony pertaining to that exhibit did not prejudice defendants and was therefore harmless.[25]

Regarding Workman, defendants assert that the court improperly precluded Workman's surrebuttal testimony concerning analysis of Grobbel's flow measurements incorporated into exhibit 135. However, it does not appear that Workman was qualified to render such an opinion, given that his expertise was in aquatic biology and his analysis of the flow measurements pertained to aquatic wildlife and habitat rather than hydrology or hydrogeology, for which Workman was offering surrebuttal testimony. Indeed, under MRE 702, an expert must be qualified "by knowledge, skill, experience, training, or education" before rendering an opinion. *Craig, supra* at 78. In light of this, the trial court did not abuse its discretion by precluding Workman's testimony on this issue.

### G. EXPERT FEES AND COSTS

Merit Energy challenges the trial court's award pursuant to the RJA and, alternatively, MEPA for "other

---

[25] We note that, contrary to defendants' assertion, the record reveals that the trial court admitted exhibit TT in its entirety.

costs," as well as transcript costs under "Category D"[26] and the transcript cost of James Janiczek.[27] Merit Energy is correct in part. "[T]he award of taxable costs to the prevailing party is within the trial court's discretion." *Allard v State Farm Ins Co*, 271 Mich App 394, 403; 722 NW2d 268 (2006). "However, what constitutes costs is governed by statute, and questions of statutory construction are reviewed de novo." *Nestlé, supra* at 106 (citations omitted).

The RJA provides the statutory authority for awards of costs and fees. *J C Bldg Corp II v Parkhurst Homes, Inc*, 217 Mich App 421, 429; 552 NW2d 466 (1996). "Under MCL 600.2405(2) [of the RJA], 'costs' include matters specially made taxable elsewhere in the statutes or court rules." *Nestlé, supra* at 107. Accordingly, plaintiffs sought costs under MCL 600.2164 (regarding recovery of costs for experts) and MCL 324.1703(3).

### i. COSTS AND FEES UNDER THE RJA

Merit Energy initially challenges the trial court's award of "other costs" under the RJA. However, plaintiffs concede that costs and fees awarded under the "other costs" category are only recoverable under MEPA through the RJA catch-all provision, MCL 600.2405(2).

---

[26] Each charge in plaintiffs' expert invoices is itemized under one of four categories: "Category T" for "Trial Matters," referring to work done in preparation for trial testimony; "Category D" for "Deposition Matters," referring to time spent preparing for and attending depositions; "Category C" for "Consultations," referring to work involving meetings with plaintiffs' attorneys regarding strategy; and "Category NL" for "Non Lawsuit" matters, referring to work done on matters before the lawsuit was filed or work done in review of matters not pertaining to the lawsuit.

[27] The DEQ also challenged the award of certain costs and fees. However, its dismissal from this matter renders those challenges moot.

Next, Merit Energy correctly argues that MCL 600.2543(2) and 600.2549 of the RJA do not permit taxation of transcript costs. At the outset, we note that except for Janiczek's transcript, for which the court expressly awarded costs under the RJA, transcript costs fall under plaintiffs' "other costs" category. However, the RJA did not support an award for any transcript costs. Indeed, plaintiffs did not acquire transcripts for the purpose of moving for a new trial or for appeal as required by MCL 600.2543(2) (pertaining to recovery for trial transcripts costs). Similarly, plaintiffs did not file with the trial court clerk any deposition transcript that was read into evidence, as required by MCL 600.2549. *Morrison v East Lansing*, 255 Mich App 505, 522; 660 NW2d 395 (2003). Consequently, the RJA did not permit an award for any transcript costs, including Janiczek's.

Although Merit Energy also challenges the award for "Category D" costs and fees on this same statutory basis, "Category D" contains no deposition transcript expense; rather, it "refers to any [expert's] work in preparation for any deposition and . . . attendance at any deposition." Thus, MCL 600.2549 is inapplicable to the review of the costs awarded for "Category D" expenses.[28]

### ii. "OTHER COSTS" UNDER MEPA

Merit Energy's final contention is that MEPA did not support an award for plaintiffs' "other costs." Although subsection 1703(3) of MEPA contains a rather open-ended cost provision stating: "Costs may be apportioned

---

[28] The DEQ raised additional arguments challenging the propriety of awards for "Category D" and "Category T" costs and fees, but since the DEQ should have been dismissed from this case, we decline to address them. See MCR 7.302(G)(4).

to the parties if the interests of justice require[,]" this Court has held that because "the statutory authority for costs is found at MCL 600.2401 *et seq.*[,] . . . the costs allowed under MEPA are the same as the costs allowed under the Revised Judicature Act." *Nestlé, supra* at 108. Thus, plaintiffs' attempt to distinguish "taxable costs" under the RJA from "costs" under MEPA is nothing more than a distinction without a difference. Consequently, the trial court erred by awarding transcript costs included in the "other costs" category as those costs were not proper under the RJA.

Additionally, we hold that the trial court erred by awarding the remainder of the "other costs" category —including expenses for copy costs, fax costs, postage, UPS overnight delivery, travel expenses, filing fees, transcripts, Westlaw research, and miscellaneous trial supplies—because these costs amount to no more than attorney fees, which are not awardable under MEPA. *Nemeth, supra* at 44. While plaintiffs assert that these costs represent expenses broader than attorney fees, this argument fails to take into account that attorney fees encompass more than just "work performed personally by members of the bar." *Allard, supra* at 404 (quotation marks and citation omitted). Rather,

> [t]he rule allowing an award of attorney fees has traditionally anticipated the allowance of a fee sufficient to cover the office overhead of an attorney together with a reasonable profit. The inclusion of . . . *the expenses incurred*[] reflects the traditional understanding that attorney fees should be sufficient to recoup at least a portion of overhead costs. Fixed overhead costs include such items as employee wages, rent, equipment rental, and so forth. Thus, until a statute or a court rule specifies otherwise, the attorney fees must take into account the work not only of attorneys, but also of secretaries, messengers, paralegals, and others whose labor contributes to the work product for which an attorney bills a client, and it must also take account of

other expenses and profit. [*Id.* at 404-405 (some emphasis in original omitted; quotation marks and citations omitted).]

Here, the additional costs categorized as "other costs" (with the exception of the transcript costs) constitute nothing more than office overhead and other expenses related to the general practice of law. Thus, these "other costs" are best described as attorney fees, for which MEPA does not expressly provide compensation. In light of this, the trial court abused its discretion by awarding "other costs" under MEPA.

### H. CONCLUSION

We reverse the trial court's June 25, 2007, opinion and final order insofar as it holds that the DEQ's easement failed to convey riparian rights to Merit Energy, and we hold that the DEQ should have been dismissed from this case. In all other respects we affirm that order. In addition, we reverse the trial court's order awarding costs and fees insofar as it pertains to the DEQ and to the extent that it awards costs for (1) Janiczek's transcript under the RJA and (2) "other costs" under MEPA. In all other respects, we affirm that order. No taxable costs pursuant to MCR 7.219, a question of public policy involved.